# ROCCA *v.* THOMPSON.

## ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 292. Argued January 17, 18, 1912.—Decided February 19, 1912.

Instructions of the head of a Department must be read in light of the statute directly bearing on the subject; and so *held* that instructions of the Secretary of State to consuls in regard to administering effects of citizens of the United States dying in foreign lands must be read in the light of § 1709, Rev. Stat.

There is no Federal probate law, but right to administer property left by a foreigner within the jurisdiction of a State is primarily committed to state law.

*Quære:* Whether it is within the treaty-making power of the National Government to provide by treaty with foreign nations for administration of property of foreigners dying within a State, and to commit such administration to consuls of the nation to which deceased owed allegiance.

"Intervene in the possession and administration of the deceased" as the expression is used in the Argentine Treaty of 1853, is to be construed as permitting the consul of either contracting nation to temporarily possess the estate of his national for the purpose of protecting it, before it comes under the jurisdiction of the laws of the country, or to protect the interests of his national in an administration already instituted otherwise than by him.

Under the Argentine Treaty of 1853 a consul has not the right to the original administration of the estate of a deceased national to the exclusion of one authorized by local law to administer the estate.

While treaties are to be liberally construed, they are to be read in the light of conditions existing when entered into with a view to effecting the objects of the contracting states.

The law of the Argentine Republic, as brought to the attention of this court, does not give to consuls of foreign countries the right to administer the estates of deceased nationals, but only to appoint an executor, which appointment is to be communicated to the testamentary judge.

*Quære:* Whether the most favored nation clause included in the treaty with Italy of 1878 carries the provisions of the Argentine Treaty of

1853 in regard to the administration by consuls of the estates of deceased nationals.

In California, the public administrator is entitled to administer the estate of an Italian citizen dying and leaving an estate in California, in preference to the Consul-General of the Kingdom of Italy; and so *held* after construing the provisions of the treaty of 1878 with Italy, and that of 1853 with the Argentine Republic.

157 California, 552, affirmed.

THE facts, which involve the construction of the provisions of the treaty of 1878 with Italy and that of 1853 with the Argentine Republic in regard to the right of consuls to administer estates of their respective natives dying in the United States, are stated in the opinion.

*Mr. Frederic R. Coudert*, with whom *Mr. Paul Fuller*, *Mr. Ambrose Gherini*, *Mr. Howard Thayer Kingsbury* and *Mr. Charles Cheyney Hyde* were on the brief, for plaintiff in error:

The treaty clauses in question, conferring the right of administration of the estates of deceased nationals upon the respective consuls, became part of the municipal law of California without further legislation and superseded any state statute not consistent therewith.

Should a state law and treaty be in conflict, the state law must give way. *Head Money Cases*, 112 U. S. 598; *United States* v. *Forty-three Gallons Whisky*, 93 U. S. 197, 198; *Ware* v. *Hilton*, 3 Dall. 235.

Treaty provisions in regard to rights in estates must be construed in most liberal fashion, and are always paramount to state legislation. *Shanks* v. *Dupont*, 3 Pet. 249; *Geofroy* v. *Riggs*, 133 U. S. 267; *Hauenstein* v. *Lynham*, 100 U. S. 488–490; and see *Wyman, Petitioner*, 191 Massachusetts, 276, criticising *Lanfear* v. *Ritchie*, 9 La. Ann. 96, as insisting on the doctrine of state rights too strongly. *People* v. *Gerke*, 5 California, 381, 384; *Forbes* v. *Scannell*, 13 California, 243, 276.

The language of the Argentine treaty contemplates ad-

ministration of estates of deceased nationals by the respective consuls.

The decision of the Supreme Court of California virtually challenges the constitutionality of the treaty, and logically and impliedly at least, although not avowedly, takes the ground that the treaty cannot supersede the local law as to administration.

The treaty must be interpreted in the light of the civil law as well as of the common law.

It is the general practice under the law of nations for consuls, upon the death of one of their nationals, to take part in caring for the property left by him, especially in case of intestacy, and seeing that it reaches its destination.

The laws of the United States on this subject are, therefore, nothing more than a codification of international usage. See Guide Pratique des Consulats, by de Clercq and de Vallat, Vol. I, 522.

For the general powers of United States consuls, see Secretary Marcy's circular of 1855. 5 Moore, Int. Law Dig., Vol. 5, 117, § 1709; Consular Regulations of the United States; Consul's Powers under the Treaties, § 411; Argentine Republic and Colombia, 161.

For duties under favored-nation clause, see § 78, Consular Regulations. Provisions occur in many treaties with foreign countries: see Art. 15, Treaty of 1880 with Belgium; Treaty of 1851 with Costa Rica, Art. 8; Treaty of 1864 with Honduras; Tenth Article of the Treaty of 1859 with Paraguay; Treaty of 1856 with Persia, Art. VI; Treaty of 1887 with Peru.

The international sanctity of such a treaty clause is instanced by the decision of the Mixed Commission in the arbitration of the Vergil claim between Peru and the United States of 1857. 4 Moore, Int. Arb. 4390.

For judicial precedents as to the right of consuls to administration, see In re Wyman, 191 Massachusetts, 276;

*In re Fattosini*, 33 N. Y. Misc. 18; *S. C.*, 67 N. Y. Supp. 1119; *In re Tartaglio* (Sur. Ct.), 12 N. Y. Misc. 245; *In re Lobrasciano*, 38 Misc. Rep. (N. Y.) 415; *S. C.*, 77 N. Y. Supp. 1040; *Matter of Logiorata*, 34 Misc. Rep. 31; *Aspinwall* v. *Queen's Proctor*, 2 Curteis Rep. 241; *Succession of Thompson*, 9 La. Ann. 96.

The view maintained by the Italian Government is supported by Devlin in his work on the Treaty Making Power, § 202.

The plain intent of the Argentine treaty, as indicated by its terms, and as evidenced in the development of international law, certainly was that the consuls should have those rights as to possession, liquidation and care of the estate which necessarily involve administration.

Under the most favored nation clause, the estates of Americans dying in Italy are guaranteed the utmost measure of consular protection that Italy may at any time accord to the estates of other nationals dying within her borders, and the converse is stipulated as to the estates of Italian subjects in the United States.

As to the interpretation of the most favored nation clause, see Mr. Hay and Mr. Hill, For. Rels., 1901, 278 (cited Moore, Int. Law, Vol. V, 318, 319); 19 Ops. Atty. Genl. 468, 470; Speed, 11 Ops. Atty. Genl. 508; 5 Moore, Int. Law, 260, 313.

The rule that the advantages of the most favored nation clause cannot be insisted upon unless reciprocal advantages are created in favor of the country upon whom the demand for favorable treatment is made does not apply, as in the present case the stipulations of the treaty are in terms reciprocal. See cases gathered in 5 Moore's International Digest, 278.

Under *Bartram* v. *Robertson*, 122 U. S. 116, and *Whitney* v. *Robertson*, 124 U. S. 190, there was a lack of equivalent which alone can make the most favored nation clause inapplicable. 2 For. Rel., 1895, 1121.

*Mr. T. W. Hickey,* with whom *Mr. Eustace Cullinan* was on the brief, for defendant in error:

The Argentine treaty does not give to consular officers of either nation the right to letters of administration in any case.

Naturally, an American court will not recognize a claim so repugnant to the general policy of our law unless it clearly appears not only that the two powers which were parties to the treaty intended but also that the American Federal Government had the authority to confer such extraordinary privileges on consular officers.

The treaty does not grant expressly the right to administer on estates. It grants only the right to "intervene" in the possession, administration and judicial liquidation.

For definition of "intervene" see Anderson's Law Dictionary; Bouvier's Law Dictionary.

In Civil Law, see Pothier, Proc. Civile, part 1, ch. 2, S. B., § 3—cited by Bouvier. 8 Ops. Atty. Genl. 99.

The word "intervene" was not ignorantly or carelessly used in the treaty. *The Neck,* 138 Fed. Rep. 144.

The cases cited by plaintiff in error can be distinguished from this case, or were not carefully considered.

Authorities on international law do not sustain plaintiff in error's contention. Vattel, Book II, ch. 17, § 287.

A consul cannot demand letters of administration conformably with the laws of California unless he takes an oath of allegiance which an alien cannot in conscience take. *Cohen* v. *Wright,* 22 California, 309.

By the terms of the treaty the consul may intervene only in conformity with the laws of the country. For. Rel. U. S., 1890, 255.

The Italian Government has acquiesced in the interpretation of the Argentine treaty suggested by defendant in error. For. Rel. U. S., 1894, 366.

The treaty with Italy entitles the Italian Consul Gen-

eral to such rights as may be granted to the officers of
the same grade of the most favored nation; but it can-
not be said that the right to administer on estates has
been granted to Argentine consuls when no Argentine
consul, since the treaty was made, has ever demanded or
received letters of administration by virtue of the treaty.

The most favored nation clause which appears in our
treaty with Italy appears also in our treaties with Bel-
gium, Germany, Great Britain, Greece, Guatemala,
Netherlands, Roumania, Servia and Spain. That our
consuls and the consuls of those other nations do not
possess this right, see 242 MS. Dom. Let. 522, archives
State Department. See provisions in Consular Con-
vention of 1878, between Italy and the United States,
Art. XVI, which is also to be found in the conventions
with Belgium, 1880, Art. XV; Germany, 1871, Art. X;
Great Britain, 1899, Art. III; Greece, 1902, Art. II;
Guatemala, 1901, Art. III; Netherlands, 1878, Art. XV;
Roumania, 1881, Art. XV; Servia, 1881, Art. II, and
Spain, 1902, Art. III.

If the parties to the Argentine treaty had intended to
concede to consuls a right so extraordinary, so subversive
of the ordinary routine of the settlement of estates, so
directly at variance with usage in countries not barbarian
or semi-barbarian, so offensive to the usual notions of
the due rights of kindred, as the right to letters of ad-
ministration in precedence of the resident heirs, they
would have made the intention plain. If the language
of the treaty does not definitely and manifestly express
such an intention, should not courts give the treaty a
construction more in conformity with the customs, and
more consistent with the notions of national dignity,
prevalent in civilized states?

The most favored nation clause in the treaty with
Italy does not entitle the Italian consular officers to de-
mand whatever privileges may be accorded to Argentine

consular officers under the treaty with the Argentine Republic.

For the meaning of the most favored nation clause, see 6 Op. Atty. Gen. 148; *Whitney* v. *Robertson*, 124 U. S. 190; *Bartram* v. *Robertson*, 122 U. S. 116; 5 Moore's Dig. Int. Law, 257 to 319; State Department Archives (160 MS. Dom. Let. 481).

If the United States has conceded to Argentine consuls the right to administer, the right was granted in return for a like right, and other rights, granted to the United States and its consuls. Italy cannot obtain gratis under the most favored nation clause a right for which the Argentine Republic has paid a price.

The Italian Consul General has to prove that the Italian Government concedes to American consuls in Italy the right to administer on the estates of intestate American citizens dying there, but, under the law, there is no way in which that fact can be proved in an American court except by a legislative act of the United States, declaring the fact to exist and commanding American courts to recognize a like right in Italian consuls. *Foster* v. *Neilson*, 2 Pet. 314; 2 Rose's Notes on U. S. Reps. 837–841; *Taylor* v. *Morton*, 2 Curt. 463.

Should the treaty-making authority in the United States provide by treaty that Argentine consuls shall have the right, in preference to the local heirs, creditors, or public administrator, to administer on the estates of citizens of the Argentine Republic dying intestate in the United States, the treaty in that respect would be void as being in excess of the constitutional powers of the treaty-making authority and a violation of the rights reserved to the States. *In re Ah Lung*, 18 Fed. Rep. 28; see note to 81 Am. Dec. 536; 5 Moore, Dig. Int. Law, 230–231.

There are doubtless limits to the treaty-making power, *Hauenstein* v. *Lynham*, 100 U. S. 490, as there are of all others arising under the Constitution. See *People* v.

*Naglee*, 1 California, 247; *People* v. *Gerke*, 5 California, 383; *The License Cases*, 5 How. 613; *Turner* v. *Baptist Union*, 5 McLean, 347; opinions collected in 5 Moore, Dig. Int. Law, 170 *et seq.*, holding that a treaty which invades the rights reserved to the States and affects the right to legislate concerning matters exclusively within the jurisdiction of the states' governments will not be enforced by the courts under the Constitution as the supreme law of the land.

There is no Federal law of administration and the administration of estates is a matter customarily left to the States.  *Frederickson* v. *Louisiana*, 23 How. 445; *Mayer* v. *Grima*, 8 How. 490.

MR. JUSTICE DAY delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of California to review a judgment in which that court held that the public administrator was entitled to letters of administration upon the estate of an Italian citizen, dying and leaving an estate in California, in preference to the Consul General of the Kingdom of Italy.

The facts are briefly these: Giuseppe Ghio, a subject of the Kingdom of Italy, died intestate on the twenty-seventh day of April, 1908, in San Joaquin County, California, leaving a personal estate.  Ghio resided in the State of California.  His widow and heirs-at-law, being minor children, resided in Italy.  Plaintiff in error, Salvatore L. Rocca, was the Consul General of the Kingdom of Italy for California, Nevada, Washington and Alaska Territory.

Upon the death of Ghio, Consul General Rocca made application to the Superior Court of California for letters of administration upon Ghio's estate.  The defendant in error, Thompson, as public administrator, made application for administration upon the same estate under the laws of California.  The Superior Court held that the

public administrator was entitled to administer the estate. The same view was taken in the Supreme Court of California. 157 California, 552. From the latter decision a writ of error was granted, which brings the case here.

The Consul General bases his claim to administer the estate upon certain provisions of the treaty of May 8, 1878 (20 Stat. 725), between Italy and the United States. Arts. XVI and XVII read as follows:

"Article XVI. In case of the death of a citizen of the United States in Italy, or of an Italian citizen in the United States, who has no known heir, or testamentary executor designated by him, the competent local authorities shall give notice of the fact to the Consuls or Consular Agents of the nation to which the deceased belongs, to the end that information may be at once transmitted to the parties interested.

"Article XVII. The respective Consuls General, Consuls, Vice Consuls and Consular Agents, as likewise the Consular Chancellors, Secretaries, Clerks or Attachés, shall enjoy in both countries, all the rights, prerogatives, immunities and privileges which are or may hereafter be granted to the officers of the same grade, of the most favoured nation." (20 U. S. Stats. at Large, p. 732.)

While article XVI only requires notice to the Italian consul or consular agent of the death of an Italian citizen in the United States, article XVII gives to consuls and similar officers of the Italian nation the rights, prerogatives, immunities and privileges which are or may be hereafter granted to an officer of the same grade of the most favored nation. It is the contention of the plaintiff in error that this favored nation clause in the Italian treaty gives him the right to administer estates of Italian citizens dying in this country, because of the privilege conferred upon consuls of the Argentine Republic by the treaty between that country and the United States, of July 27, 1853 (10 Stat. 1005), article IX of which provides:

"If any citizen of either of the two contracting parties shall die without will or testament, in any of the territories of the other, the Consul-General or Consul of the nation to which the deceased belonged, or the, representative of such Consul-General or Consul, in his absence, shall have the right to intervene in the possession, administration and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs.". (10 U. S. Stats. at Large, p. 1009.)

From this statement of the case it is apparent that the question at the foundation of the determination of the rights of the parties is found in the proper interpretation of the clause of the Argentine treaty just quoted. The question is: Does that treaty give to consuls of the Argentine Republic the right to administer the estate of citizens of that Republic dying in the United States, and a like privilege to consuls of the United States as to citizens of this country dying in the Argentine Republic? The question has been the subject of considerable litigation and has been diversely determined in the courts of this country which have had it under consideration.

The surrogate of Westchester County, New York,· in two cases, *In re Fattosini's Estate,* 67 N. Y. Supp. 1119, and *In re Lobrasciano's Estate,* 77 N. Y. Supp. 1040, has held that the treaty of Italy of 1878, in the most, favored nation clause, carried the benefit of the Argentine treaty to the consuls of Italy, and that the Argentine treaty conferred the right of administration upon the consuls of that country. In *Wyman, Petitioner,* 191 Massachusetts, 276, the Supreme Judicial Court of that State, as to Russian consuls, under the most favored nation clause in the Russian treaty, followed the surrogate's court of Westchester county, observing that the cases were well considered and covered the entire ground. The Supreme Court of Alabama, in *Carpigiani* v. *Hall,* 55 So. Rep. 248,

followed the decisions in New York and Massachusetts just referred to, and in *In re Scutella's Estate*, 129 N. Y. Supp. 20, the Appellate Division of the Supreme Court of New York pursued the same course.

A contrary view was expressed by the surrogate court of New York County in *In re Logiorato's Estate*, 69 N. Y. Supp. 507, and by the Supreme Court of Louisiana in *Lanfear* v. *Ritchie*, 9 La. Ann. 96.

An examination of the cases which have held in favor of the right of a Consul-General to administer the estate, to the exclusion of the public administrator, makes it apparent that the *Lobrasciano Case*, which is the fullest upon the subject, is the one that has been followed without independent reasoning upon the part of the courts adopting it.

In that case the right of a consul to administer the estates of deceased citizens of his country is based, not only upon the interpretation of the treaties involved, but as well upon the law of nations giving the right to consuls to administer such estates. In the opinion some citations are made from early instructions of Secretaries of State, emphasizing the right and duty of consuls to administer upon the effects of citizens of the United States dying in foreign lands.

But these instructions must be read in the light of the statute of the United States, § 1709,[1] Rev. Stat., which,

---

[1] "Sec. 1709. It shall be the duty of consuls and vice-consuls, where the laws of the country permit:

"First. To take possession of the personal estate left by any citizen of the United States, other than seamen belonging to any vessel, who shall die within their consulate, leaving there no legal representative, partner in trade, or trustee by him appointed to take care of his effects.

"Second. To inventory the same with the assistance of two merchants of the United States, or, for want of them, of any others at their choice.

"Third. To collect the debts due the deceased in the country where

while it recognizes the right of consuls and vice-consuls
to take possession of the personal estate left by any citi-
zen of the United States who shall die within their con-
sulates, leaving there no legal representative, partner or
trustee; to inventory the same, and to collect debts, pro-
vides in the fifth paragraph of the section that, if at any
time before the transmission to the United States Treas-
ury of the balance of the estate the legal representative
appears and demands his effects in the hands of the consul,
they shall be delivered up and he shall cease further pro-
ceedings, and the duties imposed are where "the laws of
the country permit."

The consular regulations of the United States tersely
express the duty of a consul as to the conservation of the
property of deceased countrymen, and declare that he
has no right, as consular officer, apart from the provisions
of treaty, local law or usage, to administer the estate, or,
in that character, to aid any other person in so adminis-
tering it, without judicial authorization. Section 409 of
the Consular Regulations is as follows:

"A consular officer is by the law of nations and by stat-
ute the provisional conservator of the property within his
district belonging to his countrymen deceased therein. He
has no right, as a consular officer, apart from the provisions
of treaty, local law, or usage, to administer on the estate,

---

he died, and pay the debts due from his estate which he shall have
there contracted.

"Fourth. To sell at auction, after reasonable public notice, such
part of the estate as shall be of a perishable nature, and such further
part, if any, as shall be necessary for the payment of his debts, and, at
the expiration of one year from his decease, the residue.

"Fifth. To transmit the balance of the estate to the Treasurer of the
United States, to be holden in trust for the legal claimant; except that
if at any time before such transmission the legal representative of the
deceased shall appear and demand his effects in their hands they shall
deliver them up, being paid their fees, and shall cease their proceed-
ings."

or in that character to aid any other person in so adminis-
tering it, without judicial authorization. His duties are
restricted to guarding and collecting the effects, and to
transmitting them to the United States, or to aid others
in so guarding, collecting and transmitting them, to be
disposed of pursuant to the law of the decedent's state—7
Op. Att. Gen. 274. It is, however, generally conceded
that a consular officer may intervene by way of observing
the proceedings, and that he may be present on the making
of the inventory."

In Moore's International Law Digest, Vol. 5, p. 123, a
letter of Mr. Hay, Secretary of State, under date of
February 3, 1900, is quoted to the effect that the right of
a United States consular officer to intervene by way of
observing proceedings in relation to the property of de-
ceased Americans leaving no representatives in foreign
countries, is not understood to involve any interference
with the functions of a public administrator.

In this country the right to administer property left
by a foreigner within the jurisdiction of a State is primarily
committed to state law. It seems to be so regulated in
the State of California, by giving the administration of
such property to the public administrator. There is, of
course, no Federal law of probate or of the administration
of estates, and, assuming for this purpose that it is within
the power of the National Government to provide by
treaty for the administration of property of foreigners
dying within the jurisdiction of the States, and to commit
such administration to the consular officers of the Nations
to which the deceased owed allegiance, we will proceed to
examine the treaties in question with a view to determining
whether such a right has been given in the present instance.

This determination depends, primarily, upon the con-
struction of Art. 9 of the Argentine treaty of 1853, giving
to the consular officers of the respective countries, as to
citizens dying intestate, the right "to intervene in the

possession, administration and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs." It will be observed that, whether in the possession, the administration or the judicial liquidation of the estate, the sole right conferred is that of intervention and that conformably with the laws of the country. Does this mean the right to administer the property of such decedent and to supersede the local law as to the administration of such estate? The right to intervene at once suggests the privilege to enter into a proceeding already begun, rather than the right to take and administer the property.

Literally, to intervene means, as the derivation of the word indicates [*inter*, between, and *venire*, come], to come between. Such is the primary definition of the word given in Webster's Dictionary and in the Century Dictionary. When the term is used in reference to legal proceedings, it covers the right of one to interpose in, or become a party to, a proceeding already instituted, as a creditor may intervene in a foreclosure suit to enforce a lien upon property or some right in connection therewith; a stockholder may sometimes intervene in a suit brought by a corporation; the Government is sometimes allowed to intervene in suits between private parties to protect a public interest, and whether we look to the English ecclesiastical law, the civil law, from which the Argentine law is derived, or the common law, the meaning is the same.

"In ecclesiastical law.—The proceeding of a third person, who, not being originally a party to the suit or proceeding, but claiming an interest in the subject-matter in dispute, in order the better to protect such interest, interposes his claim. 2 Chit. Pr. 492; 3 Chit. Commer. Law, 633; 2 Hagg. Const. 137; 3 Phillim. Ecc. Law, 586.

"In the civil law.—The act by which a third party demands to be received as a party in a suit pending between other persons.

"The intervention is made either for the purpose of being joined to the plaintiff, and to claim the same thing he does, or some other thing connected with it; or to join the defendant, and with him to oppose the claim of the plaintiff, which it is his interest to defeat. Poth. Proc. Civile, pt. 1, c. 2, § 7, no. 3.

"In practice.—A proceeding in a suit or action by which a third person is permitted by the court to make himself a party, either joining the plaintiff in claiming what is sought by the complaint, or uniting with the defendant in resisting the claims of the plaintiff, or demanding something adversely to both of them. *Logan* v. *Greenlaw* (C. C.), 12 Fed. Rep. 16; *Fischer* v. *Hanna*, 8 Colo. App. 471, 47 Pac. Rep. 303; *Gale* v. *Frazier*, 4 Dakota, 196, 30 N. W. Rep. 138; *Reay* v. *Butler* (Cal.), 7 Pac. Rep. 671." Black's Law Dictionary, p. 651.

Emphasis is laid upon the right under the Argentine treaty to intervene in *possession,* as well as administration and judicial liquidation; but this term can only have reference to the universally recognized right of a consul to temporarily possess the estate of a citizen of his nation for the purpose of protecting and conserving the rights of those interested before it comes under the jurisdiction of the laws of the country for its administration. The right to intervene in administration and judicial liquidation is for the same general purpose, and presupposes an administration or judicial liquidation instituted otherwise than by the consul, who is authorized to intervene.

So, looking at the terms of the treaty, we cannot perceive an intention to give the original administration of an estate to the Consul-General, to the exclusion of one authorized by local law to administer the estate.

But it is urged that treaties are to be liberally construed. Like other contracts, they are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects

and purposes of the States thereby contracting. *In re Ross, Petitioner,* 140 U. S. 453, 475.

It is further to be observed that treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties. Had it been the intention to commit the administration of estates of citizens of one country, dying in another, exclusively to the consul of the foreign nation, it would have been very easy to have declared that purpose in unmistakable terms. For instance, where that was the purpose, as in the treaty made with Peru in 1887 (August 31, 1887, 25 Stat. 1444), it was declared in Art. 33, (p. 1461), as follows:

"Until the conclusion of a consular convention, which the high contracting parties agree to form as soon as may be mutually convenient, it is stipulated, that in the absence of the legal heirs or representatives the consuls or vice-consuls of either party shall be ex-officio the executors or administrators of the citizens of their nation who may die within their consular jurisdictions, and of their countrymen dying at sea whose property may be brought within their district."

And in the convention between the United States and Sweden, proclaimed March 20, 1911, it is provided:

"In the event of any citizens of either of the two Contracting Parties dying without will or testament, in the territory of the other Contracting Party, the consul-general, consul, vice-consul-general, or vice-consul of the nation to which the deceased may belong, or, in his absence, the representative of such consul-general, consul, vice-consul-general, or vice-consul, shall, so far as the laws of each country will permit and pending the appointment of an administrator and until letters of administration have been granted, take charge of the property left by the deceased for the benefit of his lawful heirs and

creditors, and, moreover, have the right to be appointed as administrator of such estate."

The Argentine treaty was made in 1853, and the Italian treaty in 1878. In 1894, correspondence between Baron Fava, the then Italian Ambassador, and Mr. Uhl, Acting Secretary of State, shows that the Italian Ambassador proposed that Italian consuls in the United States be authorized, as were the American consuls in Italy, to settle the estates of deceased countrymen. It was the view of the Department of State of the United States, then expressed, that, as the administration of estates in the United States was under the control of the respective States, the proposed international agreement should not be made. The Acting Secretary of State adverted to the practical difficulties of giving such administration to consular officers, often remotely located from the place where the estate was situated. See Moore's International Law Digest, Vol. 5, p. 122.

The learned counsel for the plaintiff in error, in his supplemental brief, has referred to a statement of the law of the Argentine Confederation of 1865, English translation published in Vol. 58, British and Foreign State Papers, p. 455, in which it is said that a foreigner dying intestate, without leaving a wife or lawful heirs in the Argentine Republic, or where he dies leaving a will, the heirs being foreigners absent from the country and the executor being also absent, the consul of the deceased foreigner's nation is given the right to intervene in the arrangement of his affairs. In Arts. III and IV it is declared:

"III. Consular intervention shall be confined to—1st. Sealing up the goods, furniture and papers of the deceased, after giving due notice to the local authorities, provided always that the death has taken place within the Consular district. 2d. Appointing executors.

"IV. The Consuls shall at once communicate to the testamentary Judge the appointment of such executors."

It is contended that the right secured to a foreign consul to appoint an executor under this act of 1865 is evidence of the fact that the Argentine Republic is carrying out the treaty in the sense contended for by the plaintiff in error; but in this law certainly no right of administration is given to the consul of a foreign country. It is true, he may appoint an executor, which appointment it is provided is to be at once communicated to the testamentary judge.

In Art. VIII the same law provides that executors shall perform their charge in accordance with the laws of the country. Art. XIII declares that the rights granted by the law shall be only in favor of the nations which cede equal privileges to Argentine consuls and citizens.

Our conclusion then is that, if it should be conceded for this purpose that the most favored nation clause in the Italian treaty carries the provisions of the Argentine treaty to the consuls of the Italian Government in the respect contended for, (a question unnecessary to decide in this case), yet there was no purpose in the Argentine treaty to take away from the States the right of local administration provided by their laws, upon the estates of deceased citizens of a foreign country, and to commit the same to the consuls of such foreign nation, to the exclusion of those entitled to administer as provided by the local laws of the State within which such foreigner resides and leaves property at the time of decease.

We find no error in the judgment of the Supreme Court of the State of California, and the same is

*Affirmed.*