Justice THOMAS, dissenting.
I remain of the view that the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., does not apply to proceedings in state courts. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 285-297, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (dissenting opinion); see also Preston v. Ferrer, 552 U.S. 346, 363, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) (same); Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (same); Green Tree Financial Corp . v. Bazzle, 539 U.S. 444, 460, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (same); Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 689, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (same). Thus, the FAA does not require state courts to order arbitration. Accordingly, I would affirm the judgment of the California Court of Appeal.
Justice GINSBURG, with whom Justice SOTOMAYOR joins, dissenting.
It has become routine, in a large part due to this Court's decisions, for powerful economic enterprises to write into their form contracts with consumers and employees no-class-action arbitration clauses. The form contract in this case contains a Delphic provision stating that "if the law of your state" does not permit agreements barring class arbitration, then the entire agreement to arbitrate becomes unenforceable, freeing the aggrieved customer to commence class-based litigation in court. This Court reads that provision in a manner most protective of the drafting enterprise. I would read it, as the California court did, to give the customer, not the drafter, the benefit of the doubt. Acknowledging the precedent so far set by the Court, I would take no further step to disarm consumers, leaving them without effective access to justice.
I
This case began as a putative class action in state court claiming that DIRECTV, by imposing hefty early-termination fees, violated California consumer-protective legislation, including the Consumers Legal Remedies Act (CLRA), Cal. Civ.Code Ann. § 1750 et seq. (West 2015). App. 58. DIRECTV did not initially seek to stop the lawsuit and compel bilateral arbitration. See id., at 52-53. The reason for DIRECTV's failure to oppose the litigation is no mystery. The version of DIRECTV's *472 service agreement applicable in this case (the 2007 version) requires consumers to arbitrate all disputes and to forgo class arbitration. Id., at 128-129. If the relevant provision stopped there, the Court's recent precedent, see American Express Co. v. Italian Colors Restaurant, 570 U.S. ----, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013) ; AT & T Mobility LLC v. Concepcion, 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), would control, and DIRECTV could have resisted the lawsuit. But DIRECTV's form contract continued: The entire arbitration clause is unenforceable "[i]f ... the law of your state would find" unenforceable the agreement's class-arbitration prohibition. App. 129. At the time plaintiff-respondents Imburgia and Greiner commenced their court action, class-arbitration bars like the one in DIRECTV's agreement were per se unenforceable as unconscionable under the law of California. See Discover Bank v. Superior Court, 36 Cal.4th 148, 162-163, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1110 (2005).
Nearly three years into the litigation, this Court held in Concepcion, 563 U.S., at 338-351, 131 S.Ct. 1740, that the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., preempts state rules that render class-arbitration bans unenforceable. DIRECTV then moved to halt the long-pending lawsuit and compel bilateral arbitration. App. to Pet. for Cert. 4a. The California Superior Court denied DIRECTV's motion, No. BC398295 (Super. Ct. Los Angeles Cty., Cal., Jan. 26, 2012), App. to Pet. for Cert. 17a-20a, and the California Court of Appeal affirmed. The Court of Appeal first observed that, under the California law DIRECTV confronted when it drafted the clause in question, provisions relinquishing the right to proceed under the CLRA on behalf of a class would not be enforced. 225 Cal.App.4th 338, 342, 170 Cal.Rptr.3d 190, 194 (2014). The question dispositive of DIRECTV's motion, the California court explained, trains on the meaning of the atypical contractual phrase "the law of your state": "does it mean 'the law of your state to the extent it is not preempted by the FAA,' or 'the law of your state without considering the preemptive effect, if any, of the FAA'?" Id., at 344, 170 Cal.Rptr.3d, at 195.
In resolving this question, the California court emphasized that DIRECTV drafted the service agreement, giving its customers no say in the matter, and reserving to itself the right to modify the agreement unilaterally at any time. Id., at 345, 170 Cal.Rptr.3d, at 196. See also Brief for Respondents 1-2. DIRECTV used the same take-it-or-leave-it contract everywhere it did business. Ibid . "[T]o protect the party who did not choose the language from an unintended or unfair result," the California court applied "the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." 225 Cal.App.4th, at 345, 170 Cal.Rptr.3d, at 196 (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ). That rule was particularly appropriate in this case, the court reasoned, for, "as a practical matter, it seems unlikely that plaintiffs anticipated in 2007 that the Supreme Court would hold in 2011 that the FAA preempts" state-law protection against compelled class-arbitration waivers. 225 Cal.App.4th, at 345, 170 Cal.Rptr.3d, at 196 (internal quotation marks omitted).
II
The Court today holds that the California Court of Appeal interpreted the language in DIRECTV's service agreement so unreasonably as to suggest discrimination against arbitration in violation of the *473 FAA. Ante, at 469 - 470. As I see it, the California court's interpretation of the "law of your state" provision is not only reasonable, it is entirely right.
Arbitration is a matter of "consent, not coercion." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) (internal quotation marks omitted). The FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). "[T]he interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review." Id., at 474, 109 S.Ct. 1248. See also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (when interpreting arbitration agreements, courts "should apply ordinary state-law principles that govern the formation of contracts"). Historically, this Court has respected state-court interpretations of arbitration agreements. See Mastrobuono, 514 U.S., at 60, n. 4, 115 S.Ct. 1212 ; Volt Information Sciences, 489 U.S., at 484, 109 S.Ct. 1248. Indeed, in the more than 25 years between Volt Information Sciences and this case, not once has this Court reversed a state-court decision on the ground that the state court misapplied state contract law when it determined the meaning of a term in a particular arbitration agreement. Today's decision is a dangerous first.
Beyond genuine debate, DIRECTV originally meant the "law of your state" clause to refer to its customer's home state law untouched by federal preemption. As DIRECTV explained in a state-court filing, the clause prevented enforcement of the arbitration agreement in those States, California among them, where the class-arbitration proscription was unenforceable as a matter of state law, while requiring bilateral arbitration in States that did not outlaw purported waivers of class proceedings. App. 52 ("The Customer Agreement between DIRECTV and its customers provides that the customer's home state laws will govern the relationship, and that any disputes will be resolved in individual arbitration if the customer's home state laws enforce the parties' arbitration agreement." (emphasis added)).
According to DIRECTV, because the class-arbitration ban, post-Concepcion, is enforceable in all States, this case must now be resolved, if at all, in bilateral arbitration. The Court agrees. After Concepcion, the Court maintains, it no longer matters whether DIRECTV meant California's "home state laws" when it drafted the 2007 version of its service agreement. But Concepcion held only that a State cannot compel a party to engage in class arbitration when the controlling agreement unconditionally prohibits class procedures. See 563 U.S., at 351, 131 S.Ct. 1740 ("Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations," so parties may consent to class procedures even though such procedures "may not be required by state law."). Just as a contract itself may provide for class arbitration, so the parties may choose to be bound by a particular state law, in this case, the CLRA, even if the FAA would otherwise displace that state law. Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 586, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) ("[T]he FAA lets parties tailor some, even many, features of arbitration by contract, including ... procedure and choice of substantive law.").[1] "In principle," the Court acknowledges, *474 parties "might choose to have portions of their contract governed by the law of Tibet, [or] the law of pre-revolutionary Russia." Ante, at 468 ; see Brief for Petitioner 20 (observing that the FAA would allow parties "to bind themselves by reference to the rules of a board game"). Pre-revolutionary Russian law, but not California's "home state laws" operative and unquestionably valid in 2007? Makes little sense to me.
Nothing in Concepcion or the FAA ifies provisions of the CLRA. They hold sway when parties elect judicial resolution of their disputes, and should similarly control when parties choose that consumer-protective law to govern their arbitration agreements. See Volt Information Sciences, 489 U.S., at 475, 109 S.Ct. 1248 (where parties had "incorporat[ed] ... California rules of arbitration into their agreement," they had "no FAA-guaranteed right to compel arbitration" on terms inconsistent with those California rules).[2] Thus, even after Concepcion, one could properly refer to the CLRA's class-waiver proscription as "California law." To repeat, the dispositive question in this case is whether the parties intended the "law of your state" provision to mean state law as preempted by federal law, as the Court today reads the provision, or home state law as framed by the California Legislature, without considering the preemptive effect of federal law, as the California court read it.
The latter reading is the better one. DIRECTV had no occasion to refer to "the law of [its customer's] state" had it meant to incorporate state law as preempted by the FAA. That is, DIRECTV, like virtually every other company with a similar service agreement, could have employed a clause directly conditioning enforceability of the arbitration agreement on the exclusion of class arbitration. Indeed, DIRECTV has done just that in service agreements both before and after 2007. App. 121 (the 2004 version provides that "[a] Court may sever any portion of [the arbitration agreement] that it finds to be unenforceable, except for the prohibition on class or representative arbitration"); Brief for Respondents 35-36 (stating that the June 2015 version of DIRECTV's agreement provides that "[a] court may sever any portion of [the arbitration agreement] that it finds to be unenforceable, except for the prohibition on [class arbitration]" (internal quotation marks omitted)). Had DIRECTV followed this pattern in its 2007 form contract, the arbitration agreement, post-Concepcion, unquestionably would have been enforceable in all States. In the 2007 version, however, DIRECTV
*475 chose a different formulation, one referring to the "law of [its customer's] state." I would not translate that term to be synonymous with "federal law." If DIRECTV meant to exclude the application of California legislation, it surely chose a bizarre way to accomplish that result.
As earlier noted, see supra, at 472 - 473, and as the California court appreciated, courts generally construe ambiguous contractual terms against the drafter. See Mastrobuono, 514 U.S., at 63, 115 S.Ct. 1212 ("Respondents drafted an ambiguous document, and they cannot now claim the benefit of the doubt."). This "common-law rule of contract interpretation," id., at 62, 115 S.Ct. 1212, reflects the principle that a party should not be permitted to write an ambiguous term, lock another party into agreeing to that term, and then reap the benefit of the ambiguity once a dispute emerges. The rule has particular force where, as here, a court is interpreting a "standardized contrac[t]" that was not the product of bilateral bargaining. Restatement (Second) of Contracts § 206, Comment a (1979).
Allowing DIRECTV to reap the benefit of an ambiguity it could have avoided would ignore not just the hugely unequal bargaining power of the parties, but also their reasonable expectations at the time the contract was formed. See Mastrobuono, 514 U.S., at 63, 115 S.Ct. 1212 (it is particularly appropriate to construe terms against the drafter where the other party had no reason to anticipate or intend the drafter's preferred result). See also Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 262, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) ("[C]ontract[s] ... are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects and purposes of the [parties] thereby contracting." (quoting Rocca v. Thompson, 223 U.S. 317, 331-332, 32 S.Ct. 207, 56 L.Ed. 453 (1912) ; ellipsis in original)). At the time DIRECTV imposed this agreement on its customers, it assumed that the arbitration clause would be unenforceable in California. App. 52 (explaining in state-court filing that, "[b]ecause California law would not enforce the arbitration agreement ..., DIRECTV has not sought and will not seek to arbitrate disputes with California customers"). Likewise, any California customer who read the agreement would scarcely have understood that she had submitted to bilateral arbitration of any and all disputes with DIRECTV. She certainly would have had no reason to anticipate the Court's decision in Concepcion, rendered four years later, or to consider whether "law of your state" is a chameleon term meaning California legislation when she received her service contract, but preemptive federal law later on.
DIRECTV primarily responds that the FAA requires construction of all terms in arbitration agreements in favor of arbitrability. True, this Court has found in the FAA a "federal policy favoring arbitration." Ante, at 471 (quoting Volt Information Sciences, 489 U.S., at 476, 109 S.Ct. 1248 ). But the Court has also cautioned that an arbitration-favoring presumption applies "only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed[, is] legally enforceable[,] and [is] best construed to encompass the dispute." Granite Rock Co. v. Teamsters, 561 U.S. 287, 303, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010). DIRECTV acknowledges that "[t]his case ... involves a threshold dispute over the enforceability of the parties' arbitration agreement" in its entirety. Reply Brief 7. Like the California court, I would resolve that dispute by employing *476 traditional rules of contract interpretation sans any arbitration-favoring presumption, including the rule that ambiguous language should be construed against the drafter. Seesupra, at 472 - 473, 474 - 475.
III
Today's decision steps beyond Concepcion and Italian Colors . There, as here, the Court misread the FAA to deprive consumers of effective relief against powerful economic entities that write no-class-action arbitration clauses into their form contracts. In Concepcion, 563 U.S., at 336, 131 S.Ct. 1740, customers brought a class action claiming that AT & T Mobility had improperly charged $30.22 in sales tax while advertising cellular telephones as free. AT & T Mobility's form consumer contract contained a mandatory arbitration clause and a class-arbitration proscription. Because consumers lacked input into the contractual terms, and because few rational consumers would go through the hassle of pursuing a $30.22 claim in bilateral arbitration, the California courts deemed the arbitration agreement unenforceable as unconscionable. See id., at 365, 131 S.Ct. 1740 (BREYER, J., dissenting) (" '[T]he maximum gain to a customer for the hassle of arbitrating a $30.22 dispute is still just $30.22.' " (quoting Laster v. AT & T Mobility LLC, 584 F.3d 849, 856 (C.A.9 2009) )); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (C.A.7 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."), cert. denied, 543 U.S. 1051, 125 S.Ct. 877, 160 L.Ed.2d 772 (2005). Nonetheless, the Court held that the FAA mandated enforcement of the entire arbitration agreement, including the class-arbitration ban. Concepcion, 563 U.S., at 343, 131 S.Ct. 1740. Two years later, in Italian Colors, 570 U.S., at ----, 133 S.Ct., at 2310, the Court reaffirmed that class-arbitration prohibitions are enforceable even where claimants "have no economic incentive to pursue their ... claims individually in arbitration." Today, the Court holds that consumers lack not only protection against unambiguous class-arbitration bans in adhesion contracts. They lack even the benefit of the doubt when anomalous terms in such contracts reasonably could be construed to protect their rights.[3]
*477 These decisions have predictably resulted in the deprivation of consumers' rights to seek redress for losses, and, turning the coin, they have insulated powerful economic interests from liability for violations of consumer-protection laws. See N.Y. Times, Nov. 1, 2015, p. A1, col. 5 ("By inserting individual arbitration clauses into a soaring number of consumer and employment contracts, companies [have] devised a way to circumvent the courts and bar people from joining together in class-action lawsuits, realistically the only tool citizens have to fight illegal or deceitful business practices."). Studies confirm that hardly any consumers take advantage of bilateral arbitration to pursue small-dollar claims. Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2900-2910 (2015) (Resnik, Diffusing Disputes). Because consumers lack bargaining power to change the terms of consumer adhesion contracts ex ante, "[t]he providers [have] won the power to impose a mandatory, no-opt-out system in their own private 'courts' designed to preclude aggregate litigation." Resnik, Fairness in Numbers: A Comment on AT & T v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78, 133 (2011). See also Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 323 (2013) ("[P]owerful economic entities can impose no-class-action-arbitration clauses on people with little or no bargaining position-through adhesion contracts involving securities accounts, credit cards, mobile phones, car rentals, and many other social amenities and necessities.").[4] The proliferation of take-it-or-leave-it agreements mandating arbitration and banning class procedures, and this Court's readiness to enforce such one-sided agreements, have disabled consumers from "shop[ping] to avoid arbitration mandates." Resnik, Diffusing Disputes 2839. See also id., at 2872 ("[T]he numbers of clauses mandating arbitration are soaring across many sectors.").
The Court has suggested that these anticonsumer outcomes flow inexorably from the text and purpose of the FAA. But Congress passed the FAA in 1925 as a response to the reluctance of some judges to enforce commercial arbitration agreements between merchants with relatively equal bargaining power. Moses, Arbitration Law: Who's in Charge? 40 Seton Hall L. Rev. 147, 170-171 (2010). See also id., at 170 (contract disputes between merchants have been a proper subject of arbitration since the 1600's). The FAA's purpose was to "make the contracting party live up to his agreement." H.R.Rep. No. 68-96, at 1 (1924). See also Moses, supra, at 147 (Congress sought to "provide federal courts with procedural law that would permit the enforcement of arbitration agreements between merchants in diversity cases."). Congress in 1925 could not have anticipated that the Court would apply the FAA to render consumer adhesion *478 contracts invulnerable to attack by parties who never meaningfully agreed to arbitration in the first place. See Resnik, Diffusing Disputes 2860 ("The merchants and lawyers who forged the public law of arbitration in the United States sought federal legislation to enforce consensual agreements." (emphasis added)).
Nor does the text of the FAA compel this result. Section 2, on which the Court relied in Concepcion, Italian Colors, and this case, prescribes simply that arbitration provisions are to be treated the same as other contractual terms: "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As Justice O'Connor observed when the Court was just beginning to transform the FAA into what it has become, "the Court has abandoned all pretense of ascertaining congressional intent with respect to the Federal Arbitration Act, building instead, case by case, an edifice of its own creation." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 283, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (concurring opinion). See also Miller,supra, at 324 ("[O]ver the years the Act has been transformed by the Supreme Court through constant expansion into an expression of a 'federal policy' favoring arbitration, whether it involves a bilateral business dispute or not.").
The Court's ever-larger expansion of the FAA's scope contrasts sharply with how other countries treat mandatory arbitration clauses in consumer contracts of adhesion. A 1993 European Union Directive forbids binding consumers to unfair contractual terms, defined as those "not ... individually negotiated" that "caus[e] a significant imbalance in the parties' rights and obligations ... to the detriment of the consumer." Coun. Directive 93/13, Art. 3, 1993 O.J. (L. 95) 31. A subsequent EU Recommendation interpreted this Directive to bar enforcement of one-party-dictated mandatory consumer arbitration agreements. Comm'n Recommendation 98/257, 1998 O.J. (L. 115) 34 ("The consumer's recourse to the out-of-court procedure may not be the result of a commitment prior to the materialisation of the dispute, where such commitment has the effect of depriving the consumer of his right to bring an action before the courts for the settlement of the dispute."). As a result of this Directive and Recommendation, disputes between providers and consumers in the EU are arbitrated only when the parties mutually agree to arbitration on a "post-dispute basis." Sternlight, Is the U.S. Out on a Limb? Comparing the U.S. Approach to Mandatory Consumer and Employment Arbitration to That of the Rest of the World, 56 U. Miami L. Rev. 831, 847-848 (2002) (emphasis deleted); see id., at 852 (enforcement of mandatory arbitration clauses in consumer contracts of adhesion "is quite rare, if not nonexistent," outside the United States).
* * *
The California Court of Appeal appropriately applied traditional tools of state contract law to interpret DIRECTV's reference to the home state laws of its customers. Demeaning that court's judgment through harsh construction, this Court has again expanded the scope of the FAA, further degrading the rights of consumers and further insulating already powerful economic entities from liability for unlawful acts. I resist the Court's bent, and would affirm the judgment of the California Court of Appeal.

FAA preemption is distinct from federal preemption in other contexts. Unlike "state laws invalidated by, for example, federal labor law, federal pension law, or federal civil rights law," ante, at 470, state laws are preempted by the FAA only to the extent that they conflict with the contracting parties' intent. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 59, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ("[I]n the absence of contractual intent to the contrary, the FAA would pre-empt" a particular state law. (emphasis added)); Brief for Law Professors as Amicus Curiae 10 ("FAA preemption cannot occur without reference to a particular agreement of the parties....").

The Court refers to the relevant California law as the "Discover Bank rule" and suggests that, "under 'general contract principles,' references to California law incorporate the California Legislature's power to change the law retroactively." Ante, at 469. But despite this Court's rejection of the Discover Bank rule in Concepcion, the California Legislature has not capitulated; it has retained without change the CLRA's class-waiver prohibition. The Discover Bank rule relied on an interpretation of the FAA, see 36 Cal.4th 148, 162-173, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1100-1117 (2005) ; in contrast, the CLRA's class-waiver proscription reflects California's legislative policy judgment.

It has not always been this way. In Wilko v. Swan, 346 U.S. 427, 435, 438, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Court unanimously held that an arbitration clause in a brokerage agreement was unenforceable. The Court noted that the Securities Act was "drafted with an eye to the disadvantages under which buyers labor" when negotiating brokerage agreements, id., at 435, 74 S.Ct. 182, and described arbitration as less protective of the rights of stock buyers than litigation, id., at 435-437, 74 S.Ct. 182. The Court later overruled Wilko, rejecting what it described as Wilko 's "suspicion of arbitration as a method of weakening the protections afforded in the substantive law." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). See also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (relying on Rodriguez de Quijas to conclude that "[m]ere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context"). Similarly, before Italian Colors , the Court had suggested that "the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum," and when that is so, an arbitration agreement may be unenforceable. Green Tree Financial Corp.-Ala. v. Randolph, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Although the Court in Italian Colors did not expressly reject this "effective vindication" principle, the Court's refusal to apply the principle in that case suggests that the principle will no longer apply in any case. See 570 U.S., at ----, 133 S.Ct., at 2320 (KAGAN, J., dissenting); CompuCredit Corp. v. Greenwood, 565 U.S. ----, ---- - ----, 132 S.Ct. 665, 676, 181 L.Ed.2d 586 (2012) (GINSBURG, J., dissenting) (criticizing the Court for ignoring a federal statutory "right to sue" and for holding "that credit repair organizations can escape suit by providing in their take-it-or-leave-it contracts that arbitration will serve as the parties' sole dispute-resolution mechanism").

The Consumer Financial Protection Bureau recently published a study documenting the proliferation of mandatory arbitration clauses containing class-arbitration waivers in consumer financial-services contracts, as well as the vanishingly small number of claims brought by financial-services consumers in bilateral arbitration. See Consumer Financial Protection Bureau, Arbitration Study § 1, pp. 9-13 (2015).