Nichols, C. J.
Vincenzo Basile, an Italian subject, born in the province of Messina, died intestate November 9, 1913, in Trumbull county, Ohio.
He left no heirs in the United States, but did leave surviving him, as his only heirs at law and next of kin, a widow and two minor children, all of whom were at the time of the death of Basile residents of the Kingdom of Italy and subjects of that nation.
The estate of decedent consisted solely of an unliquidated claim for damages for his wrongful death.'
Dr. Nicola Cerri is now and has been continuously since 1900 the duly qualified, recognized and acting consular officer for the Kingdom of Italy in *347 and for Northern Ohio, his jurisdiction as such extending to and including Trumbull county. Dr. Cerri, although likewise an Italian subject, is and has been since 1900 a resident of Cleveland, Ohio,
On November 26, 1913, Giovanni Pagano was appointed administrator of the estate of the decedent by the probate court of Trumbull county. Shortly thereafter Dr. Cerri, such consular agent, filed a motion in the Trumbull county probate court seeking the removal of the administrator so appointed, on the ground that the appointment had been made in contravention of the general law of nations, and particularly of Articles 9, 16 and 17 of the consular convention of 1878 between the United States of America and the Kingdom of Italy, and of the rights, privileges and immunities accruing to the said consular agent thereunder by virtue of Article 10 of the treaty of 1859 between the United States of America and Paraguay and Article 14 of the treaty of 1911 between the United States of America and the Kingdom of Sweden.
In January, 1914, said probate court overruled the motion. Appeal was taken to the court of common pleas by the consular agent. Decision was again had in favor of the administrator so appointed and against Dr. Cerri, the consular agent.
Error was thereupon prosecuted to the court of appeals, which court reversed both the probate and common pleas courts, and its mandate was issued to the probate court of Trumbull county directing it to sustain the motion to revoke the letters of administration to Pagano and to appoint Dr. Cerri, such consular agent, as administrator of decedent Basile.
*348 The administrator so deposed filed his motion in the supreme court asking that the court of appeals of such county be directed to certify its record to this court, on the ground that the case was one of great general interest. The motion was granted and the record was accordingly certified.
This case relates wholly to the administration of the estates of aliens dying intestate in Ohio. It is asserted by Dr. Cerri that by virtue of his office as consular agent for the Kingdom of Italy he is invested with the sole, exclusive and paramount right to be appointed as administrator of the estates of all subjects of Italy dying in northern Ohio who may die intestate. His claim is that the probate court is without discretion in the premises, and amounts in effect to supplanting the provisions of Section 10617, General Code of Ohio, wherein preference is given, first, to the husband or widow, second, to the next of kin, third, to creditors, and fourth, to such persons as the court deems fit, in the discretion of the probate court having jurisdiction.
The claim thus asserted would seem by the mere statement of it to be a most extraordinary one, yet it is not without some substantial basis for its support.
This basis is to be found in the provisions of Article 17 of the treaty between Italy and the United States and Article 14 of the treaty between Sweden and the United States.
Article 17, known as the most-favored-nation clause, appears in all modern treaties between the United States and the other great powers, and is as follows:
*349 “Article XVII. The respective consuls general, consuls, vice-consuls and consular agents, as likewise the consular chancellors, secretaries, clerks or attaches, shall enjoy in both countries, all the rights, prerogatives, immunities and privileges which are or may hereafter be granted to the officers of the same grade, of the most favoured nation.”
Article 14 of the Swedish treaty provides:
“In the event of any citizens of either of the two contracting parties dying without will or testament, in the territory of the other contracting party, the consul-general, consul, vice-consul-general, or vice-consul of the nation to which the deceased may belong, or, in his absence, the representative of such consul-general, consul, vice-consul-general, or vice-consul, shall, so far as the laws of each country will permit and pending the appointment of an administrator and until letters of administration have been granted, take charge of the property left by the deceased for the benefit of his lawful heirs and creditors, and, moreover, have the right to be appointed as administrator of such estate.”
While the provisions of Article 14 of the Swedish treaty were not incorporated in the Italian treaty of 1878, yet it is vigorously claimed that by the terms of Article 17 of the Italian treaty the consuls of that country are entitled to the same rights, privileges and prerogatives granted the Swedish consuls, just as fully indeed as if Article 14 had been inserted in the Italian treaty.
This proposition is not free from doubt. In fact, the supreme court of the United States, in the case of Rocca v. Thompson, 223 U. S., 317, raises a *350 question as to the soundness of the claim, the ninth proposition of the syllabus reading: “Quaere: Whether the most favored nation clause included in the treaty with Italy of 1878 carries the provisions of the Argentine Treaty of 1853 in regard to the administration by consuls of the estates of deceased nationals.”
This court, however, in its consideration of the instant case will assume that the consuls of Italy, by reason of the “most favored nation” rule, are like beneficiaries with the Swedish consuls of all the rights and privileges conferred by Article 14 of the Swedish treaty.
Covenants and agreements among the civilized nations of the earth, commonly called treaties, are the most sacred engagements of which we can conceive. Not only are honor and good faith of the nation put to the test, but any deliberate infraction of treaty obligations leads inevitably to the arbitrament of arms. The courts of the land, therefore, by every rule of reason, are chargeable with the duty of fairly and carefully considering questions arising under the treaty engagements entered into by the national government with foreign powers. Such engagements should be interpreted in a broad and liberal spirit, for certainly here hairsplitting distinctions have no shadow of excuse for their existence.
However, at the very threshold of the case we are met with a distinct challenge as to the power of the national government, in the exercise of its treaty-making function, to invest the consul of any foreign nation with the sole, prior and paramount *351 right to administer upon the estates of their deceased fellow countrymen, anything in the laws of the several states of the Union to the contrary notwithstanding.
There is no federal holding to the effect that the national government can constitutionally exercise any such sweeping power; indeed, within the last four years, the supreme court of the United States itself questions the right of the federal government to enter into any such engagement with a foreign power. See Rocca v. Thompson, supra.
While this is a question of power rather than policy, yet we feel that public policy, whether looked at from a national or a state standpoint, would forbid the exercise of such a power.
Shaw, J., of the supreme court of California, in the case of Estate of Ghio, 157 Cal., 552, 557, says: “It is also of grave importance because its solution in favor of the appellant necessarily ascribes to the federal government the intent, by means of its treaty-making power, to materially abridge the autonomy of the several states and to interfere with and direct the state tribunals in proceedings affecting private property within their jurisdictions. It is obvious that such intent is not to be lightly imputed to the federal government, and that it cannot be allowed to exist except where the language used in a treaty plainly expresses it, or necessarily implies it.”
The constitution of the United States does reserve to the exclusive domain of the executive and the United States senate the treaty-making power, yet this grant to the federal government and the *352 denial to the several states has its limitations of power.
A treaty duly ratified has no more binding force than an act of congress generally, and as to its subject-matter clearly it cannot overstep the limitations of the federal constitution.
It would manifestly be beyond the power of the United States government to provide by treaty with Italy that subjects of Italy resident of Ohio should be entitled to exemption from execution for debts for an amount in excess of that granted citizens of Ohio, or to provide that such subjects should be entitled to obtain a divorce on the ground of desertion or wilful absence for one year, whereas to other citizens the right was limited to absence for three years.
The administration of the estates of the deceased inhabitants of a state is peculiarly a state and not a federal matter, and many of our most distinguished secretaries of state for the United States have always recognized it as a state affair.
It is clearly to be seen that in the making of the Swedish treaty full recognition was given to this fact, and the government at Washington limited the rights and prerogatives granted consuls of Sweden and of all other countries and bound itself to vouch for only such rights and privileges as the laws of each country would permit; the meaning of the word “country” being, so far as it applied to the United States, “thé states of such country.”
Substantially similar language is to be found in every treaty entered into between our own government and every foreign country, the form of the *353 limitation varying, sometimes reading “So far as the laws of each country will permit;” at other times reading “Conformably with the laws of the country.” But in no instance can there be found a case where the government of the United States binds itself by treaty to confer any such exclusive right of administration independent of the state-law-conformity limitation. Such a uniform construction of its own limitation of power by the federal government, existing for so long a period of time, is certainly tantamount to a declaration that the several states have, under the tenth amendment to the federal constitution, the reserved right to regulate the matter of the administration of the estates of aliens dying intestate within their jurisdictions as a strictly domestic concern.
The second proposition of the syllabus in Rocca v. Thompson, supra, reads: “There is no Federal probate law, but right to administer property left by a foreigner within the jurisdiction of a State is primarily committed to state law.”
This does not hold, of course, that congress might not enact a probate law applicable to the administration of the estates of deceased aliens, but, taken with the “Quaere” which immediately follows the proposition just quoted, it suggests the existence of a substantial doubt in the minds of the judges of the Union’s highest tribunal, the court saying: “Quaere: Whether it is within the treaty-making power of the National Government to provide by treaty with foreign nations for administration of property of foreigners dying within a State, and *354 to commit such administration to consuls of the nation to which deceased owed allegiance.”
This court, however, will not undertake to decide this phase of the case. It certainly would be much more appropriate for the supreme court of the United States to determine the limitation of the federal government as to its treaty-making power, and in view of the construction given the language of the Swedish treaty of 1911 by the court of appeals of the seventh district of Ohio, it would seem that it is imperative that the supreme court of the United States give to the courts of the several states the proper construction it feels should be given this language, and at the same time define the limitation of power on the part of the federal government, if any there be, in this respect.
This court, in the instant case, has reached a conclusion different from that of the court of appeals in construing the Swedish treaty. It feels that the federal government, in entering into this-engagement, has not sought to give to foreign consuls the sole,' prior and paramount right of administration, as asserted by the defendant in error.
We hold that the federal government has had due regard for the rights of the several states and has not accorded any privileges to foreign consuls in conflict with the laws of all or any of the several states of the Union. The claim that these superior and paramount rights have been accorded foreign consuls rests wholly on the last clause of Article 14 of the Swedish treaty, reading: "and, moreover, have the right to he appointed as administrator of such estate ”
*355 If this clause stood as an independent paragraph of the treaty there woúld be available a good and valid argument to the effect that the federal government had assumed to ignore or set aside the laws of the several states on the subject of the administration of estates, and had granted to foreign consuls a prior and paramount right and privilege denied to any of our own citizens. But this clause, under no sensible rule of construction, can be isolated from the context of Article 14, but must be read with it, and its true meaning and intent thus ascertained. Taking the article as an entirety, it is readily to be ascertained that the right of a foreign consul to take charge of the property of the deceased pending the appointment of an administrator is subject to a positive limitation in the express language of the treaty. It can only be done “so far as the laws of each country [state] will permit.”
Now this is mere custodianship — preservation only — not administration. It cannot approach in importance to the matter of administration, settlement and distribution. It is temporary in its nature : implies the exercise of dominion only for the purpose of safe-keeping.
It is unthinkable that our national government would surround this limited privilege or grant of power to a foreign consul with the safeguard of conformity to state laws and in the same article and in the very next expression grant the far greater power of complete administration without restriction or limitation of any kind whatever.
*356 We cannot in reason attribute any such course of conduct to the president and the senate of the United States. Whether the limitation in the firs' instance be induced by a sense of want of power, or be it merely a matter of policy, the same wisdom that would suggest the limitation laid down as to custodianship would operate to require the identical limitation as to permanent and final administration. Indeed, many more potent arguments could readily be advanced in support of the wisdom of imposing the limitation in the latter case than in the former.
But quite apart from such line of reasoning, it appears clear to us that a proper grammatical construction of Article 14 in its entirety will support the .position that the clause “And, moreover, have the right to be appointed as administrator of such estate” is to be modified by the qualifying phrase “So far as the laws of each country will permit.” The word “moreover” is defined as meaning “in addition thereto,” “also,” “furthermore,” “likewise.” It certainly will not constitute an act of grammatical violence to hold that the “moreover” clause is to be modified by the “so far as the laws will permit” clause.
The “consul-general, consul, vice-consul-general, or vice-consul” is the compound subject of the sentence and directly the subject of both “shall take” and “shall have.”
These officers, it is written, “shall take charge” of the decedent’s effects and “shall have the right to administer,” The punctuation of the article is *357 such that the subject in each instance is expressed and is in no part of the article to be supplied or understood.
If it had been the clear intention to limit the “right to administer” in the same set terms as the “right to take charge,” as we think it was, it certainly would have been a grammatical solecism to have repeated after the word “moreover” the clause “so far as the laws of the country will permit,” and the failure so to do cannot therefore be urged as an argument in favor of another and different construction.
It is to be supposed that in the framing of a, treaty the high contracting parties bring to the task of its preparation their most eminent linguists and scholars, men who measure every phrase and scrutinize every word.
Much importance is attached by plaintiff in error to the employment of the word “moreover,” as if the choice of this term indicated an independent grant of power, entirely disassociated from all that had gone before. The contrary appears to us to be the more reasonable construction, and we are altogether convinced that the term was used in the sense of its meaning of “also” or “likewise.” With ■this meaning given the term “moreover,” its relative importance passes out and we have the treaty reading “and, likewise, have the right to be appointed as administrator of such estate.”
This construction is in harmony with the ofttime expressed views of our high officials whose duty it is to put into proper language the tentative draft *358 of a contemplated treaty. It is in harmony with the proper respect that our federal officers have manifested for the reserved rights guaranteed to the several states by the national constitution. It is likewise in harmony with the uniform practice of the national government for the full period of its existence. Any other construction would work a departure from the established and well-settled policy of more than a century.
We therefore hold that the right of the Italian consul to administer on the estate of Vincenzo Basile, as vested in him by the treaty with Sweden, is not such as to supplant the administration statutes of Ohio.
This right is subject to the limitations and provisions of the Ohio statutes relating to the administration of estates.
The probate court is not divested of its discretion in the premises. It may select Dr. Cerri or it may reject him.
It may well be the proper thing — the wise thing in many, if not most, instances — to select the consular agent, especially where the range of selection is limited to the class mentioned in the fourth paragraph of Section 10617, General Code, but this must be left to the wisdom of the appointing power.
Counsel for defendant in error place great dependence on the observations of Justice Day in the Rocca case, supra, the claim being made that in the course of his opinion in that case the learned justice undertook to construe the language of the *359 clause of the . Swedish treaty under consideration, and in so doing gave it the construction contended for by defendant in error.
In the course of his opinion in that case, at page 332, Justice Day said: “Had it been the intention to commit the administration of estates of citizens of one country, dying in another, exclusively to the consul of the foreign nation, it would have been very easy to have declared that purpose in unmistakable terms. For instance, where that was the purpose, as * * * In the convention between the United States and Sweden, proclaimed March 20, 1911, it is provided.” Then .follows Article 14 of the Swedish treaty.
This construction, however, cannot be employed as binding authority of the courts of the several states, for the very good reason that the eminent jurist made use of the Swedish treaty merely as an illustration. It was not in the case then under consideration, for the still better reason that the rights of the respective parties accrued in 1908, whereas the Swedish treaty was not ratified until 1911.
The views that' this court here express are supported by the recent decision of the supreme court of Minnesota in the case of Austro-Hungarian Consul v. Westphal, 120 Minn., 122, and by decision of the court of appeals of New York, In re Estate of D’Adamo, 212 N. Y., 214, the first-cited case having been decided December 27, 1912, and the latter July 14, 1914 — both after the decision of the supreme court of the United States in the Rocca case, supra, which bore date of Febrüary 19, 1912.
*360 The judgment of the court of appeals of Trumbull county is therefore reversed and that of the probate court of same county is affirmed.

Judgment reversed.

Johnson, Wanamaker, Jones and Matthias, JJ., concur.
Newman, J., dissents.