In the Matter of the Estate of JOHN HOUSTON, Deceased.

Surrogate's Court, Nassau County, October 13, 1932.

*Arthur A. Michell,* for the British Consul.

HOWELL, S. In the final decree in the account of the trustee in the above estate made February 4, 1930, it was adjudged that in default of a general guardian being appointed, the sum of $307.81, the distributive share of Agnes McCulloch Paterson, an infant, be paid into court by deposit of the same with the treasurer of the county of Nassau. Such deposit was made. A petition is now presented in behalf of Agnes McCulloch Paterson accompanied with proof that she has attained the age of twenty-one years and seeking payment to her of the amount thus on deposit with the county treasurer. The applicant is a British subject residing in Scotland. The petition is made in her name but is executed, acknowledged and verified on her behalf by one of the British Consuls in the city of New York. The question presented is whether a petition so signed and executed is sufficient to authorize an order upon the county treasurer to pay the amount in question to the applicant or to the British Consul in New York on her behalf. The fund in question was deposited with the treasurer pursuant to the provision of section 229 of the Surrogate's Court Act. Such section makes the provisions of law relating to money paid into court in a Supreme Court action applicable to moneys paid to the county treasurer by order of the Surrogate's Court. The latter court remains in control over the fund and has jurisdiction to make

a valid decree affecting its disposition. (*Matter of Bergamini*, 136 Misc. 118, and authorities there cited.)

Furthermore, unless a contrary intent is expressed in or implied from the text of the Surrogate's Court Act, provisions of law or of rules effective in the Supreme Court apply to proceedings in the Surrogate's Court. (Surr. Ct. Act, § 316.)

The provisions of law relative to the disposition of moneys paid into court are found in sections 136 and 137 of the Civil Practice Act which provide in substance that the court may direct the payment out of money paid into court in any manner or form that appears to the court best for the interest of the owners of such funds, the directions in the decree to be founded upon proper and sufficient evidence satisfactory to the court that such disposition is best for the interest of the owners of the fund; but that no money shall be paid out without the production of a properly certified copy of the order of the court " duly made and entered " directing such disposition.

The provisions of section 137 of the Civil Practice Act were held not to protect the county treasurer or city chamberlain in paying out such funds unless the order was " duly made " and that such an order was not duly made unless based upon the papers required by the statute. (*Youngs* v. *Goodman*, 202 App. Div. 690.)

Following this decision, section 137 was amended in 1927,* so as to protect the depositary from liability if payment out was made by him in good faith in accordance with the order of the court.

Sections 136 and 137 of the Civil Practice Act do not prescribe the procedure necessary to obtain funds so deposited.

The provisions of the rules applicable thereto are to be found at present in rules 31, 32 and 33 of the Rules of Civil Practice. They provide in substance that all consents for the payment of money out of court shall be acknowledged before an officer authorized to take the acknowledgment of deeds, shall be accompanied by proof of the identity of the applicant from some person other than the applicant; that the application must be made by way of petition " duly verified and acknowledged;" that the order shall direct payment to be made to the person entitled to receive the same, and that the draft shall likewise be drawn payable to the order of the person entitled thereto. The latter provisions have been in the rules since 1910, prior to which time the rules permitted the order and draft to be payable to the order of the person entitled to the fund " or his attorney duly authorized."

It would appear quite clear, therefore, that under the present

* Laws of 1927, chap. 185.

rules both the order and the draft must be payable to the person entitled to the fund and it would further seem to follow from the provisions of the present rules, particularly those requiring the consent and the petition to be acknowledged, that it is contemplated that the application be made by petition executed by the person entitled to the fund and that the order shall direct the payment to be made to that person.

There is here presented, therefore, the question whether such application may be made by petition executed, verified and acknowledged by the British Consul in behalf of the person entitled to the fund where such person is a British subject residing in Great Britain.

It has long been recognized that our local law of administration of estates has been displaced in some respects by foreign treaties. The extent of the displacement, however, was for years an unsettled question in this State. Following the decision of the Supreme Court of the United States in *Rocca* v. *Thompson* (223 U. S. 317), which upheld the California Supreme Court in sustaining the prior right of the public administrator over the Italian Consul in administration of the estate of an Italian subject dying in California, the Court of Appeals in our State in *Matter of D'Adamo* (212 N. Y. 215) considered the subject thoroughly and held that the treaty provisions were to be construed as adding foreign Consuls to the list of those eligible as administrators so as to enable them to administer upon the estates of their fellow-citizens when no one having a prior right under the local laws was competent or willing to act; but that such treaty provisions were not intended to supersede local law and confer right of administration upon foreign Consuls exclusive and paramount to all others. The court pointed out that its decision in construing such treaties was in harmony with the function of Consuls under established international practice which had been stated in decisions and confirmed in statutes; that that function included the duty of such Consuls when their countrymen died in foreign lands to step in and guard their property from waste; and that such right belonged to them irrespective of statute or treaty, by virtue of their office. Such right, however, yields to the supreme right of legally constituted representatives and if there be such representative the Consul's function is limited to one of co-operation and intervention.

That decision, therefore, is effective upon the question of the Consul's right to letters of administration. It does not purport to pass upon the question of the Consul's right to appear for or intervene in behalf of one of his countrymen who is interested as legatee, distributee or otherwise in the estate of a person dying

in this country and whose estate is being administered here by duly accredited representatives. There have been, however, several decisions of various Surrogates' Courts in this State on that question.

In *Matter of Tartaglio* (12 Misc. 245) the estate of an Italian subject who had died intestate leaving personal property to be administered in the county of Westchester, State of New York, the distributive shares of his widow and minor children, who were residents and subjects of Italy, had by decree of the surrogate been paid to and deposited with the county treasurer. The Consul General of Italy in the city of New York applied to the surrogate for the payment to him of those distributive shares. The county treasurer opposed the application upon the ground that such Consul-General was without authority to demand and receive the same. The learned surrogate pointed out that the rights of subjects of foreign countries both as to their personal and their real property depended largely upon treaty provisions; that the treaty between the United States and Italy provided that Consul-Generals might have recourse to the authorities of their respective countries " in order to defend the rights and interest of their countrymen; " that giving the word " defend " its broadest meaning, as should be done in such a case, it included the power to maintain affirmatively the rights of his countrymen, and that our local courts recognize such rights in obedience to the treaty, although in the absence of such treaty, the foreign Consul would have much the same power. The surrogate quoted the rule laid down by Chancellor KENT, as follows: " the practice of our courts is that foreign consul may assert and defend as complainant party the rights and property of a person of his nation; " and also cited *The Bello Corrunes* (6 Wheat. 168), where the court said " that a vice-consul duly recognized by our government is a competent party to assert or defend the rights of property of the individuals of his nation in any court having jurisdiction of causes affected by the application of international law. To watch over the rights and interests of their subjects wherever the pursuits of commerce may draw them or the vicissitudes of human affairs may force them is the great object for which consuls are deputed by their sovereigns, and in a country where laws govern and justice is sought for in courts only it would be a mockery to preclude them from the only avenue through which their course lies to the end of their mission. The long and universal usage of the courts of the United States has sanctioned the exercise of this right, and it is impossible that any evil or inconvenience can flow from it."

And finally in supporting his decision to make the order applied for, the surrogate said: " The right to demand and sue for neces-

sarily implies the authority to acquit and release. In case of a debt due by a resident of this state to the widow and children of Libretto Tartaglio there would seem to be no doubt not only of the consul's power, but his duty under the authorities to demand and collect it, and if so, I can see no reason in principle that would prevent his demanding and receiving moneys or property deposited in court belonging to a subject of such consul's country. Neither can I see that the infancy of some of the parties affects or limits the right or power of the consul. The question as to what disposition may be made of the property after the consul has received and exported it is something with which our courts have nothing to do; that is to be settled by the laws or authority of the government to which the foreign subject owes allegiance."

To similar effect was the decision of the Surrogate's Court in Kings county in *Matter of Davenport* (43 Misc. 573), holding that the Italian Consul-General had the right to receive from the public administrator of Kings county a balance payable by him as such administrator to the next of kin of an Italian subject who had died intestate while residing in Kings county. His sole next of kin was his father who was an Italian subject residing in Italy and the court determined that it was not necessary that the payment be made to him directly, the decision being based upon the right of the Consul to " intervene " given by the treaty, which the court held included the right to receive property belonging to another alien.

These decisions were followed in *Matter of Baldasarro* (92 Misc. 627) and *Matter of D'Adamo* (94 id. 1).

In *Matter of Peterson* (51 Misc. 267), however, this right was held to apply to adults only and not to infants upon the ground that the treaty could not be properly construed as providing more broadly for alien infants. than for native infants. In that case a Danish subject had died in this State and the Danish Consul here applied for the probate of her will, the executor named having predeceased the testatrix. The sole heirs at law and next of kin were Danish subjects residing in Denmark. Some were adults and some were infants. The Danish Consul claimed the right to represent them in the probate proceeding and to waive the issuance and citation in their behalf. The surrogate did not question his right so to do in the case of the adults but held that he might not so do in the case of the infants in the absence of any express provision of the treaties covering the subject. There being no such provisions, the laws of the State of New York governed and those laws do not admit of the waiver of an infant's rights. To the same effect is the decision in *Matter of Nyahay* (66 Misc. 418).

On the other hand, in *Matter of Bristow* (63 Misc. 637), Surrogate KETCHAM in Kings county recognized the right of the Italian Consul to appear for infant subjects of and residing in Italy, and set aside an order appointing a special guardian for such subjects.

The decisions last cited are not necessarily conflicting. If an infant is an alien, citation must issue and be served; but if the foreign Consul by right of treaty assumes to appear for the infant, the provisions of the statute relating to special guardians yield to the treaty's right, and a special guardian need not be appointed.

It happens that in all the cases above cited the estate involved was that of an alien who had died a resident of this State. It does not appear, however, that the rights conferred by the treaties upon a foreign Consul to intervene, appear or defend in behalf of his countrymen, are confined to estates being administered here of subjects of his country, and unless so confined by the treaties, there would seem to be no valid reason why his right to protect and defend the rights and interests of his countrymen should not extend to their rights and interests in estates of United States citizens being administered in the State of New York.

In *Matter of Reiss* (138 Misc. 845) it does not appear from the opinion whether the decedent was a citizen of this country or whether he died resident here a subject of Roumania. The case was presented to Surrogate WINGATE in Kings county on the petition of the executors of the decedent to settle their account as such. There was included a proposed direction in the final decree to the effect that the share in the estate of one Fannie Margulescu, who was a subject and resident of the Kingdom of Roumania, should be paid to her and not to the Roumanian Consul-General. Citation had been served in the accounting proceeding and the Roumanian Consul-General served notice of appearance in behalf of the legatee in question, undertaking to act for her as a subject and resident of the Kingdom of Roumania. Following the service of such notice of appearance, however, there was filed in the Surrogate's Court a duly authenticated power of attorney properly executed by the legatee in person, authorizing Elias Reiss of New York city to appear and act for her. The question presented, therefore, was whether by virtue of the treaty between the United States and the Kingdom of Roumania which in general authorized a Roumanian Consul-General to represent his nationals, was entitled to precedence over a power of attorney executed by such national in person to another individual. The treaty, however, provided that the right of the Consul to appear in behalf of absent heirs was limited by the words " until they are duly represented." Construing the provisions together, therefore, it was clear that the

Consul-General was entitled to represent his nationals in all matters where they had not specifically appeared but that personal appearance by such national or its equivalent by power of attorney, resulted in the individual or his personal attorney superseding the Consul-General. The surrogate consequently held that the decree properly provided for payment of the distributive share in question to her personally.

It would seem to follow from these authorities that in case of treaty provisions authorizing a foreign Consul to intervene, or to appear for, or to assert, maintain or defend the rights and interests of his nationals in this State, those provisions would supersede the provisions of our rules of court requiring application for payment out of court of a distributive share belonging to one of his nationals to be made by that national in person and requiring the order and draft to be made payable to him personally, and would permit the application to be made by the Consul on his own behalf and the payment to be made to such Consul for the national.

In the case now before me the fund is concededly in court waiting to be paid over to the petitioner whose identity is proven and who is unquestionably entitled to the payment. The amount involved is less than $500. It does not seem to me that in such a case she should be put to the trouble and expense involved in personal verification and acknowledgment of the petition. If she executed a power of attorney to someone in this case to apply in her behalf the donee of such power could undoubtedly make the application. Where it appears, as it does here, that the British Consul is authorized to act in her behalf in this respect it seems to me that a formal power of attorney is quite unnecessary. If at the time the decree in this State was made the petitioner had been of age, the payment of her legacy under the authorities cited might well have been made to the British Consul in her behalf in the absence of an appearance by her individually or under power of attorney. The fact that, due to her infancy, payment has been delayed for a short time, and the money in the meantime held in court, should not affect the general principle involved.

Under the circumstances presented and the amount involved, therefore, an order will be made directing the payment of the moneys on deposit with the county treasurer to the petitioner through the British Consul as her representative.