CLAY, Circuit Judge,
dissenting.
The majority rejects the possibility that a clause incorporating “lapse of time” defenses in the extradition treaty in question may include constitutional speedy trial protections. Rather, the majority claims, the phrase “lapse of time” refers only to a fixed statutory limitations period. But the majority cannot point to any part of the 1978 Treaty that supports its interpretation of Article 7. Instead, the majority leaves out the most important facts, disregards both the plain language and the plain purpose of Article 7, relies on a cascade of inapposite citations, and rests its conclusion on an erroneous presumption in favor of extradition.
In assessing whether Cruz Martinez’s speedy trial rights were violated, here is what the majority left out of its opinion. Unexplained and lengthy delays stretched more than six years from the issuance of the Mexican arrest warrant to the time Mexico requested Cruz Martinez’s arrest. Cruz Martinez was not a fugitive, nor had he any knowledge that he was wanted by U.S. or Mexican authorities. To the contrary, he lived openly in the United States under his own name and had willingly returned to Mexico multiple times both for immigration purposes and to vacation with his family. Yet, prior to his arrest, which came nearly seven and a half years after Cruz Martinez’s alleged crime was reported to the Mexican authorities, neither he nor his family was ever informed of the outstanding warrant.
*472 What happened to Cruz Martinez is precisely the sort of delay against which Article 7 was designed to protect. In applying the unambiguous textual prerequisites of the 1978 Treaty to the facts of this case, it is clear that the rights guaranteed to those facing extradition under Article 7 include the protection against untimely prosecution — a protection embodied in the Sixth Amendment’s Speedy Trial Clause. Read for its ordinary meaning, this language incorporates those bodies of law in both countries that protect against untimely criminal prosecution. The Sixth Amendment’s Speedy Trial Clause falls squarely within this scope.
Since a literal reading of Article 7 incorporates the speedy trial right, Cruz Martinez should be able to raise as a defense that his extradition is barred under the terms of the governing treaty. But the analysis does not end there. Contrary to what the majority suggests, this dissent does not contend that Cruz Martinez’s speedy trial rights under the Sixth Amendment have in fact been violated; rather, that determination should be made by the district court on remand. To arrive at such a determination, the Supreme Court has outlined four factors to be weighed in a balancing test. See Barker v. Wingo, 407 U.S. 514, 529-30, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (holding that courts are to consider the “[ljength of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant.”). Because the district court never reached the Barker v. Wingo test for constitutional speedy trial violations, it is imperative that this case be remanded for further consideration.
Regrettably, the majority fundamentally misapprehends the principal issue. The majority’s holding would allow the United States government to extradite one of its own citizens to face prosecution in Mexico even if doing so would result in a criminal prosecution of the U.S. citizen in violation of the U.S. Constitution. The 1978 Treaty between the United States and Mexico was designed to prevent this outcome: it forbids extradition if criminal prosecution “has become barred by lapse of time according to the laws of the requesting or requested Party.” Extradition Treaty, U.S.-Mex., art. 7, May 4, 1978, 31 U.S.T. 5059 (emphasis added).[1] This reciprocal language is not ambiguous and means only one thing: if an extraditee’s criminal prose-cutioñ would be barred due to the lapse of time in the United States, then his extradition to the requesting country must be refused; and vice versa, if an extraditee’s criminal prosecution of a Mexican citizen would be barred by the laws of Mexico, his extradition to the requesting country would likewise be prohibited.
I.
Again, what the majority fails to acknowledge is the total absence of any indication that Cruz Martinez was a fugitive who fled Mexico to avoid prosecution. Here is the full story.
At the time of the shooting, Cruz Martinez was a lawful permanent resident of *473 the United States and had been continuously living and working in this country, with that status, for more than fifteen years. Despite his residence in the United States, Cruz Martinez frequently traveled back to Santa María Natividad, where his family lived, including his wife and children. Santa María Natividad “is a very small village where basically everyone knows each other.” (R. 2-17, Declaration of Antolina Flores Alfaro, PagelD# 327.)
As the majority indicates, after the shooting on December 31, 2005, in which Cruz Martinez was allegedly involved, the town clerk of Santa María Natividad presided over a meeting between Cruz Martinez’s wife and brother, on the one side, and the widow and parents of one of the shooting victims, Solano Cruz, on the other. At that meeting, both families signed an agreement that had been drafted by the “District Court for San Pedro Silaeayoa-pan, Oaxaca.” (Id. at 335.) The agreement identified Cruz Martinez as the person “who committed the homicide” and provided that his family would pay 50,000 pesos to the family of Solano Cruz. (Id.) The 50,000 peso payment, however, was not the only purpose of the agreement. The agreement concluded with the following language:
The Town Clerk, for his part, as an authority of the community, asks that both parties respect these agreements, which were issued in the district to which we belong. He also asks that none of the parties in this matter holds a grudge, as we maintain respect towards one another in our community, especially because this unfortunate act took place between families. He asks that once the parties accept this agreement and commit to enact its terms, that the matter shall be closed.
(Id. at 335-36.)
Cruz Martinez’s wife “understood that the agreement resolved the case and that [Cruz Martinez] would not be charged with any crime.” (Id. at 328.) She explained that the family of the other victim, Antolin Cruz Reyes, “has never claimed that [Cruz Martinez] committed any crime against Cruz Reyes.” (Id. at 327.)
But in an entirely separate series of events, and unbeknownst to Cruz Martinez and his family, a cousin of Solano Cruz who was not a party to the agreement reported the homicide to the Attorney General for the State of Oaxaca in January 2006. The cousin, a witness to the shooting, gave the state authorities a firsthand account of what happened. A deputy municipal official who was also present at the scene gave a corroborating statement on the same date. Based on these statements and the investigation that followed, on February 23, 2006, the Oaxacan authorities issued a warrant for Cruz Martinez’s arrest on charges of homicide with “unfair advantage” resulting from his use of a firearm. (R. 2-13, Extradition Packet, Pa-gelD# 202.)
Meanwhile, Cruz Martinez had returned to the United States, where he continued to live openly under his own name. His landlord verified in a letter submitted to the district court that he had lived in the same apartment in Lebanon, Tennessee since April 2006. The uncontested evidence below established that Cruz Martinez’s family in Santa María Natividad was never informed of the warrant for his arrest. Cruz Martinez’s wife and children continued to live in Santa María Natividad until 2007, when they left to join him in the United States, in part because of harassment from the family of Solano Cruz. Even after 2007, Cruz Martinez’s brother and father continued to live in the community and remained there as of the commencement of the extradition proceedings in 2013. Yet in all this time, Cruz Martinez’s *474 family was never informed of a warrant or of any case pending against him. Even beyond Cruz Martinez’s family, it was common knowledge in the tight-knit community of Santa María Natividad that he lived and worked in the United States.
There is no indication at all in the record of when the Mexican government first learned of Cruz Martinez’s whereabouts in the United States. Certainly no obstacle to discovering his location has ever been identified. It is more accurate to say that despite the existence of a variety of avenues readily available for ascertaining Cruz Martinez’s location — whether by communication with his family or acquaintances in Santa María Natividad, or by simple inquiry or background check within the United States — the Mexican government made no effort that is reflected in the record of these proceedings to search for him or to obtain his extradition for more than six years.
In an unexplained turn of events, it was the United States government that next followed up on the Mexican arrest warrant. In September 2009, more than three and a half years after the shooting, a U.S. Consular Official contacted the Silacayoa-pan district court to inquire about the status of the warrant. The court responded that the warrant was still “pending and executable.” (Id. at 250-51.) The record does not reflect that any further action was taken and the United States government has refused to disclose any records related to the 2009 inquiry.
On May 21, 2012,.Mexico submitted a diplomatic note to the U.S. Department of State invoking the “urgency” clause of the 1978 Treaty to request Cruz Martinez’s provisional arrest. See 1978 Treaty, art. 11. The note explained that “[t]he URGENCY to present the request ... is justified by the fact that AVELINO CRUZ MARTINEZ has been located” at a given address in Lebanon, Tennessee and that “[i]t is feared that he may move elsewhere and his whereabouts will become unknown.” (R. 2-6, Initial Extradition Request, Pa-gelD# 80.) In October 2012, months after Mexico submitted its request for Cruz Martinez’s provisional arrest, both the United States and Mexico issued posters identifying Cruz Martinez as wanted on murder charges in Mexico. Nevertheless, no attempt was made to arrest him in 2012.
During this period, Cruz Martinez, who had obtained U.S. citizenship in October 2010, was working to obtain lawful permanent resident status for his wife and children. In late 2012 or early 2013, he made a number of trips to Mexico to meet with U.S. consular officials — the very same governmental agency that made the 2009 inquiry. The purpose of his trip was to seek immigration waivers for his family. During these multiple trips, neither Mexican nor U.S. authorities took any steps to detain him or to inform him of the pending warrant and extradition request; nor was he prevented from returning to the United States.
On June 11, 2013, acting on behalf of the Mexican government, the United States filed a complaint in the Middle District of Tennessee seeking Cruz Martinez’s provisional arrest for the purposes of extradition. Cruz Martinez was finally arrested on June 21, 2013, nearly seven and a half years after the shooting was reported to the Mexican authorities, and seven years and four months after the issuance of the arrest warrant.
II.
I concur in the majority’s holding that Cruz Martinez’s extradition is not barred under Article 7 by the U.S. statute of limitations. The Mexican arrest warrant *475 was the functional equivalent of an indictment and should be granted the same tolling effect. See Sainez v. Venables, 588 F.3d 713, 717 (9th Cir. 2009) (“[F]or the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of limitations.”). However, I part ways with the majority as to whether Article 7 incorporates the Sixth Amendment’s right to a speedy trial.

A Treaty Interpretation

The Supreme Court has made clear that any analysis of whether Article 7 incorporates the Sixth Amendment’s Speedy Trial Clause must begin “with the text of the treaty and the context in which the written words are used.” Air France v. Saks, 470 U.S. 392, 397, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). And where the text is clear, as it is here, neither pages of inapposite citations, nor an erroneous presumption in favor of extradition, provides a basis for deviating from this “time-honored textual approach.” Medellín v. Texas, 552 U.S. 491, 514, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); see also Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (“[WJhere the text is clear, as it is here, we have no power to insert an amendment.”).
In interpreting a treaty, as in interpreting a statute, the Supreme Court has directed that courts must first look to its plain language. See Medellín, 552 U.S. at 506, 128 S.Ct. 1346 (“The interpretation of a treaty, like the interpretation of a statute, begins with its text.”); Air France, 470 U.S. at 399, 105 S.Ct. 1338 (noting that courts must give “the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.”). The text of a treaty must be “interpreted in good faith in accordance ■with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose.” Vienna Convention on the Law of Treaties, May 23, 1969, art. 31(1), 1155 U.N.T.S. 331; Restatement (Third) of Foreign Relations Law of the United States (‘Restatement”) § 325(1) (1986). Only if the language of a treaty, when read in the context of its structure and purpose, is ambiguous may courts “resort to extraneous information like the history of the treaty, the content of negotiations concerning the treaty, and the practical construction adopted by the contracting parties.” Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 638 (5th Cir. 1994) (citing Eastern Airlines, 499 U.S. at 535, 111 S.Ct. 1489).
Finally, courts may not “alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial,” for doing so “would be ... an usurpation of power, and not an exercise of judicial function.” Id. (quoting Chan, 490 U.S. at 135, 109 S.Ct. 1676). Therefore, a high bar must be met before a court can read into a treaty a meaning which its words do not import. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) (“The clear import of treaty language controls unless ‘application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.’ ”) (quoting Maximov v. United States, 373 U.S. 49, 54, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963)).

B. Plain Meaning Analysis

Again, Article 7 provides that “[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.” 1978 Treaty, art. *476 7. Read for its ordinary meaning, this language incorporates those bodies of law in both countries that protect against untimely criminal prosecution. The Speedy Trial Clause of the Sixth Amendment falls squarely within this scope. In accordance with that fundamental constitutional guarantee, a criminal prosecution “become[s] barred by lapse of time according to the laws” of the United States — to borrow the language of Article 7 — when unjustified post-accusation delay results in prejudice to the defendant, or when it extends over so significant a period that prejudice will be presumed. Doggett v. United States, 505 U.S. 647, 651, 657-58, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); Klopfer v. North Carolina, 386 U.S. 213, 226, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (holding that the right to a speedy trial “is one of the most basic rights preserved by our Constitution.”).
While it is true, as the majority observes, that the passage or lapse of time is never alone dispositive of a speedy trial claim, the same may be said of statutes of limitations challenges. Both bodies of law take into account the timely or untimely action of the government, as the majority explains in its tolling discussion. Similarly, defendants may be precluded from relying on either defense if the delay results from their own intentional flight from justice. See 18 U.S.C. § 3290; Doggett, 505 U.S. at 652-54, 112 S.Ct. 2686 (analyzing whether the defendant was aware of the charges against him during the eight years that elapsed before his discovery and arrest). Although these caveats introduce additional factors into the analysis, the essential force and fundamental basis of both the Speedy Trial Clause and statutes of limitation, is the same: the passage or “lapse” of time.
Indeed, under our legal system, the protection against untimely prosecution is incomplete without the Speedy Trial Clause, which operates in concert with statutes of limitation and the Due Process Clause to protect against prejudicial prosecutorial delay. See United States v. Marion, 404 U.S. 307, 320-25, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (discussing the interlocking protection provided by statutes of limitation, the Speedy Trial Clause, and the Due Process Clause); see also United States v. Lovasco, 431 U.S. 783, 788-89, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (same); Klopfer, 386 U.S. at 226, 87 S.Ct. 988 (observing that each of the fifty states guarantees the right to a speedy trial). The Eleventh Circuit explained the complementary roles played by statutes of limitation and the Speedy Trial Clause in protecting against prejudice arising from the “lapse of time” in Stoner v. Graddick, 751 F.2d 1535 (11th Cir. 1985):
The statute of limitations is the principal device, created by the people of a state through their legislature, to protect against prejudice arising from a lapse of time between the commission of a crime and an indictment or arrest. Statutes of limitation represent legislative assessments of relative interest of the state and the defendant in administering and receiving justice. Limitations statutes, however, are not the only available protection against prejudice. The particular provisions of the Speedy Trial Clause of the Sixth Amendment are available with respect to prejudicial delay after formal indictment or information, or actual arrest.
Id. at 1540-41 (citations and quotation marks omitted).
It is therefore simply inaccurate to suggest, as the majority does, that a criminal prosecution is “barred by lapse of time according to the laws” of the United States only where there is a statute of limitations framework in place to protect the rights of the accused. See 1978 Treaty, art. 7. The *477 corresponding post-accusation protection found in the Speedy Trial Clause is an equally important defense “against prejudice arising from a lapse of time” under U.S. law. Stoner, 751 F.2d at 1540. The only way to give full effect to Article 7’s lapse of time language is to find that the provision incorporates these complementary protections.
Not only is the Speedy Trial Clause a central component of the protection against untimely prosecution, but it is also well established that criminal defendants may raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition. See Doggett, 505 U.S. at 651-58, 112 S.Ct. 2686 (finding a speedy trial violation where the U.S. government did not request the defendant’s extradition from Panama and did not seek to confirm his location during the following eight years); United States v. Heshelman, 521 Fed.Appx. 501, 505-10 (6th Cir. 2013) (holding that the U.S. government’s failure over more than three years to pursue extradition of a suspect living in Switzerland, where the suspect was not informed of the charges against him, constituted a speedy trial violation); United States v. Mendoza, 530 F.3d 758, 763 (9th Cir. 2008) (“[T]he government was required to make some effort to notify Mendoza of the indictment, or otherwise continue to actively attempt to bring him to trial, or else risk that Mendoza would remain abroad while the constitutional speedy-trial clock ticked. However, the government made no serious effort to do so.”).
If the roles of the two countries here were reversed, there is no doubt that Cruz Martinez would be able to invoke his constitutional speedy trial right in a U.S. prosecution based on the government’s failure to timely seek his extradition from Mexico; and in fact, he would stand a good chance of succeeding in his challenge and thereby barring his prosecution. See Doggett, 505 U.S. at 651-58, 112 S.Ct. 2686 (finding a speedy trial violation in comparable circumstances). Article 7 incorporates precisely that result: if criminal prosecution would be barred due to the lapse of time in the United States, then Cruz Martinez’s extradition must be refused. See 1978 Treaty, art. 7 (forbidding extradition where criminal prosecution “has become barred by lapse of time according to the laws of the requesting or requested Party.”) (emphasis added).[2]
Additionally, Article 7 is designed to serve purposes other than facilitating the reciprocal extradition of criminals, as it limits extradition rather than enables it. The apparent “object and purpose” of the provision is to provide persons facing extradition the same degree of protection against stale prosecution that the laws of the United States or of Mexico would *478 grant in a domestic criminal prosecution. See Restatement, § 325(1). The two countries may also quite reasonably have sought to incentivize the timely extradition and prosecution of criminals. See Barker, 407 U.S. at 520, 92 S.Ct. 2182 (identifying “a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused.”). Interpreting Article 7 to incorporate the Sixth Amendment’s protection against untimely prosecution furthers these purposes and is consistent with the Treaty’s protective purpose. At the very least, such an interpretation does not “effect[ ] a result inconsistent with the intent or expectations of its signatories.” Maximov, 378 U.S. at 54, 83 S.Ct. 1054.
Consequently, there is no reason to believe that the text of Article 7 gives rise to any ambiguity or doubt as to what the Treaty’s drafters intended; there is no reason to question whether the drafters really meant what they wrote into the Treaty. Indeed, courts have long recognized that “treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning, and to choose apt words in which to embody the purposes of the high contracting parties.” Rocca v. Thompson, 223 U.S. 317, 332, 32 S.Ct. 207, 56 L.Ed. 453 (1912).
But even if the language of Article 7 could somehow be seen as ambiguous, the result would be the same. The majority misreads Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933) as requiring a blanket presumption in favor of the rights of the signatory countries, and therefore in favor of extradition. But that is not what Factor stands for. What that case actually stands for is that strained or overly narrow treaty interpretations should be avoided. The Supreme Court specifically directed that “[i]n choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements,” and, in the same vein, that “if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.” 290 U.S. at 293-94, 54 S.Ct. 191. Factor therefore directs us to reject a “narrow and restricted construction” of Article 7, resolving any ambiguity in favor of a broader reading of the rights it grants to persons facing extradition.
Other cases relying on the same language favoring broad construction of rights granted by a treaty make clear that the rights accorded liberal construction under this presumption include rights granted to individuals rather than governments. See Nielsen v. Johnson, 279 U.S. 47, 52, 57-58, 49 S.Ct. 223, 73 L.Ed. 607 (1929) (adopting a broad construction of rights under a treaty to liberally construe a Danish citizen’s right to be free from discriminatory taxes in the United States under a treaty between the United States and Denmark); Jordan v. Tashiro, 278 U.S. 123, 127-29, 49 S.Ct. 47, 73 L.Ed. 214 (1928) (adopting a broad construction of rights under a treaty to liberally construe the rights of Japanese Americans to engage in commerce under a treaty between the United States and Japan).
Despite what the majority says, Factor did not announce any broad default rule in favor of extradition when interpreting an extradition treaty. All the Supreme Court did in that case was apply existing principles of treaty interpretation — principles that in no way presume that the rights of foreign governments must always be given precedence over individual rights granted by a treaty. Applying a presumption in *479 favor of extradition under Article 7 would be to distort the holding of Factor beyond recognition. If anything, we should honor Factors guidance by construing Article 7 liberally to affirm the rights which may be claimed under the Article — namely, the right to avoid extradition if criminal prosecution for the offense would be “barred by lapse of time according to the laws” of either country. 1978 Treaty, art. 7.
It is worth noting though that Factor is more than eighty years old, and hardly the only source of guidance as to how- to interpret ambiguous treaty provisions. More recent cases tell us that we should look to historical evidence of the drafters’ intent “to resolve ambiguities in the text.” Air France, 470 U.S. at 400, 105 S.Ct. 1338; see also Medellin, 552 U.S. at 506-07, 128 S.Ct. 1346 (instructing that although “[t]he interpretation of a treaty ... begins -with its text,” the Court also relies on historical materials as “aids to its interpretation” (internal quotation marks omitted)); United States v. Stuart, 489 U.S. 353, 366, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (“Non-textual sources ... often assist us in giving effect to the intent of the Treaty parties, such as a treaty’s ratification history and its subsequent operation.” (citation and quotation marks omitted)).
The limited history available supports the interpretation that Article 7 incorporates the Sixth Amendment’s right to a speedy trial. First, Article 7 uses notably broader language than the corresponding provision in the United States’ previous extradition treaty with Mexico. The prior treaty barred extradition in cases where criminal prosecution for the offense would be “barred by limitation according to the laws of the country to which the requisition is addressed.” Extradition Treaty, U.S.-Mexico, art. Ill, Feb. 22, 1899, 31 Stat. 1818 (emphasis added). Had the drafters of the 1978 Treaty intended only to incorporate statutes of limitation, they could have easily used the same “barred by limitation” language to clearly limit the scope of protection.
Moreover, the U.S. negotiators were almost certainly aware that language incorporating defenses based on the “lapse of time” could be interpreted to include the Speedy Trial Clause. When the United States negotiated and entered into the 1978 Treaty with Mexico, the only published case in the United States addressing whether the Speedy Trial Clause was incorporated by “lapse of time” language in extradition treaties was In re Extradition of Mylonas, 187 F.Supp. 716 (N.D.Ala. 1960). That case found it a matter of common sense that defenses barring prosecution based on the “lapse of time” included the Speedy Trial Clause. Id. at 721. .
The majority’s response to Mylonas — or as the majority puts it, this “twice-buried decision” — is that “Mylonas was not on anyone’s radar.” Maj. Opn. at 466. But this is misleading and wrong. For one, it was not until some fifteen years after the United States negotiated and entered into the 1978 Treaty with Mexico that Mylonas was disavowed. See Martin v. Warden, 993 F.2d 824, 829 n. 8 (11th Cir. 1993). In 1978, Mylonas not only remained good law, it was the only law on point. The Mylonas decision, at the very least, allows an inference that the drafters were aware of the possibility that Article 7 could be interpreted to include the Speedy Trial Clause. Indeed, the U.S. State Department was certainly aware of the potential scope of Mylonas, as evidenced by a June 22, 1960 letter from the State Department’s Assistant Legal Advisor to a U.S. Attorney concerning the Mylonas decision. See In re Extradition of Mackin, 668 F.2d 122, 136 (2d Cir. 1981) (quoting from that letter).
*480 At the time of the negotiations, Mylonas provided the most reliable guide for how the “barred by lapse of time” provision should apply to extradition cases. By replacing the 1978 Treaty’s “barred by limitation” phrase with “barred by lapse of time,” the drafters incorporated a broader set of rights into the new version. There is no other reason why the drafters would have chosen to replace the original “barred by limitation” language with the broader “barred by lapse of time” phrase — a phrase that describes an entire class of laws, not just statutes of limitation.
Again, even assuming the language of Article 7 were considered ambiguous, the only conclusion to be drawn from the historical evidence is that the drafters intended to incorporate the right to a speedy trial. At a minimum, the context of Mylo-nas and the departure from the more restrictive formulation of the previous treaty confirms that “application of the words of the treaty according to their obvious meaning” — i.e., to incorporate the Sixth Amendment’s right to a speedy trial— would not “effeet[] a result inconsistent with the intent or expectations of its signatories.” Maximov, 373 U.S. at 54, 83 S.Ct. 1054. We should give effect to the “apt words” chosen by the drafters of the 1978 Treaty and hold that Cruz Martinez may raise a defense to extradition on the grounds that his prosecution has become barred due to lapse of time under the Speedy Trial Clause. See Rocca, 223 U.S. at 332, 32 S.Ct. 207.

C. Cruz Martinez’s Speedy Trial Claim

What is particularly troubling about this case is that if Cruz Martinez was actually able to raise a speedy trial claim, he would probably prevail. To determine whether the lapse of time between accusation and trial constitutes a violation of the Sixth Amendment, courts balance “ ‘whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether-he suffered prejudice as the delay’s result.’ ” United States v. O’Dell, 247 F.3d 655, 667 (6th Cir. 2001) (quoting Doggett, 505 U.S. at 651, 112 S.Ct. 2686). If the government uses “reasonable diligence” in seeking to bring an accused to justice, a speedy trial claim will generally fail “as a matter of course however great the delay, so long as [the accused] could not show specific prejudice to his defense.” Doggett, 505 U.S. at 656, 112 S.Ct. 2686. “[Official bad faith in causing delay will be weighed heavily against the government,” resulting in dismissal if the delay is significant. Id. Where delay results from “official negligence in bringing an accused to trial,” the need for the accused to show prejudice from the delay lessens with the length of time elapsed. Id.
The similarities between this case and Doggett — a case where the Supreme Court found a speedy trial violation in a delay of over eight years — bring this case within the limited parameters of a presumption of prejudice. Like Cruz Martinez, Doggett left the country without knowing he was being charged with a crime. 505 U.S. at 648-49, 112 S.Ct. 2686. The United States declined to seek his extradition from Panama, despite knowing he was there, and instead asked Panama to “expel” Doggett to the United States. Id. at 649, 112 S.Ct. 2686. Although the Panamanian authorities agreed to do so, they ultimately released Doggett and let him go to Colombia, where he lived with a relative. Id. Several months later, Doggett “passed unhindered through Customs in New York City and settled down in Virginia.” Id.
Just like Cruz Martinez, Doggett lived openly under his own name in the United *481 States for six years. Id. at 649-50, 112 S.Ct. 2686. He was ultimately discovered “when the Marshal’s Service ran a simple credit check on several thousand people subject to outstanding arrest warrants and, within minutes, found out where Doggett lived and worked.” Id. at 650, 112 S.Ct. 2686. Nearly six years after his return to the United States, Doggett was arrested. Id.
Beginning with its failure to request Doggett’s extradition from Panama, and continuing through its failure to follow up on his whereabouts, the government had demonstrated, in the words of the Supreme Court, an “egregious persistence in failing to prosecute Doggett.” Id. at 657, 112 S.Ct. 2686. Indeed, “[f]or six years, the Government’s investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad.” Id. at 652-53, 112 S.Ct. 2686. Based on the length of the delay, the Court held that Doggett did not have to show how he was prejudiced:
When the Government’s negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant’s acquiescence, nor persuasively rebutted, the defendant is entitled to relief.
Id. at 658, 112 S.Ct. 2686 (citations omitted).
The similarities between this case and Doggett are striking. More than six years elapsed between the alleged shooting on December 31, 2005 and Mexico’s informal request for Cruz Martinez’s extradition in May 2012. Another year and three months passed before Mexico formalized its extradition request with the delivery of a complete packet in August 2013. And in all this time, Cruz Martinez, like Doggett, had no idea he was wanted by U.S. or Mexican authorities. Meanwhile, he lived openly in the United States under his own name and returned to Mexico multiple times — presumably “passing] unhindered through Customs” each time. Id. at 649, 112 S.Ct. 2686. At the very least, there is circumstantial evidence of negligence and unjustified failure to prosecute on the part of the Mexican government. These circumstances certainly raise a presumption of prejudice that might justify relief.
We do not, however, have the benefit of a district court decision making factual findings on these issues or analyzing the application of the Barker factors. Nor has the government been asked to present evidence that Mexico diligently sought Cruz Martinez during the period that he was living in the United States. That is why remand is necessary.
The majority suggests that it would be infeasible to conduct the fact-finding necessary to adjudicate ■ Cruz Martinez’s speedy trial claim. Yet, the administrative challenges are not nearly as grave as the majority would suggest. Application of the Barker factors in an extradition setting is not likely to result in a searching inquiry into the actions of foreign officials. In most cases, introduction of evidence that the requesting country pursued the suspect with “reasonable diligence” will end the inquiry, since under Doggett, a showing of diligence will nearly always defeat a speedy trial claim “however great the delay.” 505 U.S. at 656, 112 S.Ct. 2686. In other cases, where the accused is alleged to be a fugitive from justice, the speedy trial analysis will be comparable to the analysis already implemented by courts considering claims that the person’s flight from justice tolled the statute of limitations. See 18 U.S.C. § 3290; Jhirad v. Ferrandina, 536 F.2d 478 (2d Cir. 1976).
The 1978 Treaty offers a ready mechanism, in the form of Article 12, for the *482 United States to obtain the evidence necessary to make such a showing. That provision anticipates that there may be cases where the executive of the requested country “considers that the evidence furnished in support of the request for extradition is not sufficient to fulfill the requirements of [the] Treaty,” and therefore allows the requested country to “request the presentation of the necessary evidence.” 1978 Treaty, art. 12. This is not a discovery rule, but rather a diplomatic mechanism. There is therefore no risk that Mexico will be forced to offer up evidence of bad-faith delay for review by a U.S. court. Additionally, in light of the relaxed rules of evidence applicable in extradition hearings, proof of Mexico’s diligence may be presented in any reasonably reliable form adequate to document the country’s efforts in seeking Cruz Martinez.
Because all of this may be easily and properly accomplished well within the scope of the 1978 Treaty and the competence of U.S. magistrate judges,[3] concerns about the factual inquiry necessary for the Barker factors do not provide a reason for construing Article 7’s lapse of time defense as excluding the right to a speedy trial.

D. The Majority Opinion

The majority makes a number of arguments in its attempt to evade the plain meaning of Article 7. None of them are persuasive. First, contrary to what the majority says, no word or turn of phrase in Article 7 suggests that its application is restricted to the commencement of criminal proceedings — in fact, the express inclusion of lapse of time protection against the “enforcement of the penalty” for an offense settles any doubt that the scope of Article 7 extends beyond the initiation of prosecution, 1978 Treaty, art. 7. The majority mischaracterizes the Oaxacan statute of limitations as supporting its interpretation, glossing over the statutory language that specifically protects against undue delay during criminal proceedings. Rather than dropping out of the picture at the commencement of the prosecution, the Oaxacan statute of limitations “reset[s] and shall begin anew[ ] at the time of the reading of the charges at arraignment.” (R. 2-19, Law of the State of Oaxaca, PagelD# 378.) This effectively secures to criminal defendants protection comparable to the Speedy Trial Clause under U.S. law. Article 10(2), also cited by the majority, offers no guidance because it does not even mention the phrase “lapse of time,” much less purport to define or limit -it. 1978 Treaty, art. 10(2).
The majority then relies on a number of inapposite citations in support of its theory that Article 7’s “lapse of time” language is most naturally read to refer only to a fixed statutory limitations period. The difficulty is that, with the exception of Yapp v. Reno, 26 F.3d 1562 (11th Cir. 1994), and a handful of unpublished district court cases from California, none of the multitude of cases, treaties, or texts cited by the majority considers, much less rejects, the possibility that a clause incorporating “lapse of time” defenses in an extradition treaty may include constitutional speedy trial protections. Instead, most of these citations merely point to the use of the term “lapse of time” in some proximity to the statute of limitations. See, e.g., Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866 (providing, in an article titled “Lapse of Time” that “[ejxtradition shall not be denied on the ground that the prosecution or the penalty would be barred *483 under the statute of limitations in the Requested State.”); Black’s Law Dictionary 1321 (10th ed. 2014) (referring to the lapse of time in defining a period of prescription, but in no way equating the two as synonymous); Canadian N. Ry. Co. v. Eggen, 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920) (interpreting the term “lapse of time” to incorporate statutes of limitation in a civil maritime context).
These citations prove little, if anything. Comparison with other extradition treaties that make express reference to statutes of limitation in fact highlights the comparatively broad language employed in the U.S.-Mexico Treaty at issue today. Moreover, the extradition treaties with both Argentina and the Organization of Eastern Caribbean States, cited by the majority, mention the lapse of time and statutes of limitation in particular only to establish that a person facing extradition does not have recourse to those protections. See Extradition Treaty, U.S.-Arg., art. 7, June 10, 1997, T.I.A.S. No. 12,866; S. Treaty Doe. No. 105-13 (1997); Extradition Treaties, U.S.-O.E.C.S., art. 8, S. Treaty Doc. No. 105-19 (1997). The extradition treaty with France does contain language comparable to that with Mexico — but its specification about the treatment of acts of interruption emphasized by the majority does nothing to define or limit its incorporation of defenses to prosecution based on “lapse of time.” See Extradition Treaty, U.S.Fr., art. 9, Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997). Nor does the UN model treaty support the majority’s unduly restricted reading of Article 7. The model treaty in fact recommends even broader language that would mandatorily bar extradition “[i]f the person whose extradition is requested has, under the law of either Party, become immune from prosecution or punishment for any reason, including lapse of time or amnesty.” G.A. Res. 52/88, U.N. Model Treaty on Extradition, art. 3(e) (emphasis added).
Somewhere along the way, the majority has a “Eureka!” moment, pointing out that the Spanish version of the 1978 Treaty is titled “Prescripción.” Maj. Opn. at 459-60. But how this matters to our analysis is completely beyond rationality. To the best of my knowledge, the writer for the majority does not speak or read Spanish. And since cutting and pasting the Spanish version’s text into the less than authoritative Google Translate provides the same translations as those used by the majority, we may assume that the translations may have been taken from this questionable source. The majority’s argument is less than persuasive when one realizes that its legal argument is predicated on a popularized and less than precise translation source. Language is complex and the meaning of a word can vary greatly depending on its context, as any native speaker can attest. It would seem that the majority is defining various phrases in a vacuum without considering the appropriate contexts in which they were used.
In any event, by making this argument, the majority reveals how result-oriented it is in its attempt to reach its own conclusions. Not only is the majority willing to look beyond the Treaty’s text, and beyond our own drafters’ intent as expressed in the text, the majority even purports to rely on the presumed intent of a foreign legislature — all while pretending to understand Spanish.
Moreover, whatever the phrase “lapse of time” means in Spanish is irrelevant. All that matters is that under our own legal system, “lapse of time” incorporates the speedy trial right. The answer to the question of whether Article 7 incorporates the Speedy Trial Clause has nothing to do with what the Spanish version of the 1978 Treaty says. By offering a defense against ex *484 tradition if prosecution would be “barred by lapse of time according to the laws of the requesting or requested Party,” Article 7 incorporates the body of relevant law of both countries. 1978 Treaty, art. 7 (emphasis added). Therefore, even if Mexico does not recognize the speedy trial right, the United States certainly does, and that is enough to raise a defense under Article 7 of the Treaty.
The majority’s citing to United States v. Percheman, 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833) is totally meaningless inasmuch as that case is of little or no importance to the analysis. That case applies only when a court looks to another version of a treaty for interpretative clues, but there is no need to do so here. Certainly, there is no need to look to the Spanish version of the 1978 Treaty because whether the drafters of the Spanish version thought the phrase “lapse of time” incorporates only statutory limitation periods is totally beside the point. The only relevant question is whether under our own legal system, “lapse of time” incorporates the speedy trial right, and the answer to that question is unequivocally “yes.”
At the same time, the majority does not recognize the contradiction it falls into in making this argument. The majority argues that in some cases the litigants did not argue that a “lapse of time” provision incorporated the speedy trial right: “[n]ot one of the extraditees in these cases thought the speedy-trial point was worth their time.” Maj. Opn. at 462. Their failure to do so, the majority colorfully argues, makes this “the case'of the dog who didn’t bark.” Id. But the litigants in this case did not raise the “prescripción!” argument— this is something the majority came up with on its own. Under the majority’s logic, then, the litigants in this case must not have thought the argument was worth their time — and consequently, neither should we.
More importantly, the fact that a particular argument was not made in a particular case offers no sound guidance, much less authority, for the question before us today; it is completely baffling why the majority thinks this is important. I do not know why the litigants in the cases cited by the majority did not make certain arguments — and neither does the majority. See id. at 463-64. But "in any event, Cruz Martinez did “bark”; and the majority’s canine metaphor is no solace to him, as he has been held in detention since June 21, 2013 and is now being extradited for a crime he allegedly committed seven and a half years before Mexico signaled its intent to prosecute him.
Similarly, the unpublished district court opinions cited by the majority are neither authoritative nor persuasive. Lacking direct authority on whether Article 7 incorporates the speedy trial right, each of these cases conflates the issue with precedent addressing whether there is an inherent right to a speedy extradition, or whether the speedy trial right is incorporated by generic “remedies and recourses” language. See Gonzalez v. O’Keefe, No. C 12-2681, 2014 WL 6065880, at *2-4 (N.D. Cal. Nov. 12, 2014); In re Extradition of Flores Ortiz, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *5-6 (S.D. Cal. Feb. 9, 2011); In re Extradition of Salazar, No. 09MJ2545-BLM, 2010 WL 2925444, at *6 (S.D. Cal. July 23, 2010); United States v. Garfias, No. CR-09-xr-90128, 2009 WL 2580641, at *2-3 (N.D. Cal. Aug. 20, 2009). These unpublished district court cases from California offer no more guidance than what a particular litigant did or did not argue in some prior case.
The sole appellate case on point, Yapp v. Reno, 26 F.3d 1562 (11th Cir. 1994), offers no more intellectually robust support for *485 the majority’s position. There, the Eleventh Circuit relied on the same definition-by-proximity method of reasoning as the majority to conclude that the phrase “lapse of time” referred primarily, and ultimately exclusively, to the statute of limitations. 26 F.3d at 1566. Both Yapp and the majority cite to a comment to Restatement § 476 that discusses the applicability of statutes of limitation under various formulations of “lapse of time” protections against extradition. Id. at 1567 (citing Restatement § 476, comment (e)). That comment, however, does not purport to restrict the term “lapse of time” to statutes of limitation. Significantly, the same Restatement elsewhere indicates that the phrase “lapse of time” may encompass other defenses, such as laches:
c. Lapse of time. No general rule of international law limits the time within which a claim can be made. However, international tribunals have barred claims because of a delay in presentation to the respondent state if the delay was due to the negligence or laches of the claimant state.
Restatement § 902, comment (c) (emphasis added).
Of course, § 902 addresses interstate claims and remedies rather than extradition; nonetheless, it demonstrates that the phrase “lapse of time” may easily be used in connection with a broader set of claims and defenses than simply statutes of limitation.
Moreover, “lapse of time” is a phrase frequently used in American law in connection with any number of legal doctrines that operate based on the passage of time. For example, the term is frequently used with reference to laches and due process claims deriving from alleged unjustifiable delays. See, e.g., King v. Alaska S.S. Co., 431 F.2d 994, 996 (9th Cir. 1970) (“[T]he right to bar an action for lapse of time is a substantive right. It is conceded that the relevant lapse of time standard in maritime law is the doctrine of laches.” (citation omitted)); Costello v. United States, 365 U.S. 265, 281, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) (“In contending that lapse of time should be deemed to bar the Government from instituting this proceeding, the petitioner argues that the doctrine of laches should be applied to denaturalization proceedings, and that in any event, the delay of 27 years ... denied him due process of law in the circumstances of the case.”).
In other circumstances, “lapse of time” is used in reference to rights that are claimed to have vested based on the passage of time. See, e.g., Chase Secs. Corp. v. Donaldson, 325 U.S. 304, 311-12, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945) (“[Wjhere lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations.”); Fed. Trade Comm’n v. Algoma Lumber Co., 291 U.S. 67, 79-80, 54 S.Ct. 315, 78 L.Ed. 655 (1934) (holding that misleading advertising was still actionable thirty years after initial use because “[tjhere is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for deception or mistake ... ”). Additionally, the concept of “lapse of time” is sometimes invoked in arguments about proper judicial procedure or the proofs required to meet an evidentiary standard. See, e.g., Davis v. Adult Parole Auth., 610 F.2d 410, 414-15 (6th Cir. 1979) (discussing other courts’ holding that “the lapse of time affects the quantum of required proof as well as the good faith and credibility of the moving party.” (internal quotation marks omitted)); Berkshire Land Co. v. Fed. Sec. Co., 199 F.2d 438, 441 (3d Cir. 1952) (“The presumption of payment arising from lapse of time does *486 not work an extinguishment of the debt, nor, unlike the bar of the statute of limitations, does it require a new promise or its equivalent to revive it.” (internal quotation marks omitted)).
Finally, and of course most relevant here, “lapse of time” is used in reference to constitutional speedy trial claims. See, e.g., Doggett, 505 U.S. at 658-69, 112 S.Ct. 2686 (O’Connor, J., dissenting) (“The only harm to petitioner from the lapse of time was potential prejudice to his ability to defend his case.”); Robinson v. Whitley, 2 F.3d 562, 569 (5th Cir. 1993) (“[A] defendant will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court. In such a situation, the speedy trial clock is properly tolled.” (internal quotation marks omitted)); United States v. Greene, 737 F.2d 572, 575, n. 3 (6th Cir. 1984) (“Greene makes no contention to this Court that the lapse of time from May 10, 1983 until August 22, 1983 when the initial trial began, or the time period from August 25,1983 when a mistrial was declared, until October 24, 1983 when the second trial began, infringed upon his constitutional or statutory rights.”); United States v. Hauff, 461 F.2d 1061, 1063 (7th Cir. 1972) (“With regard to the lapse of time between the accusation and the trial, the Speedy Trial Clause guarantees to a criminal defendant! ] that the Government will move with the dispatch which is appropriate to assure him an early and proper disposition of the charges against him.” (internal quotation marks omitted)); Moser v. United States, 381 F.2d 363, 364 (9th Cir. 1967) (holding that the defendants’ speedy trial claim failed where they did not “assert, nor does anything in the trial record tend to show, that because of the lapse of time they were prejudiced in making their defense.”); see also Burns v. Lafler, 328 F.Supp.2d 711, 719 (E.D. Mich. 2004) (“To prosecute a defendant following an investigative delay does not deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time.”).
All of the above completely undermines the majority’s suggestion that interpreting Article 7 to incorporate the Sixth Amendment’s protection against untimely prosecution is a drastic deviation “from a consensus so settled.” Maj. Opn. at 466. The issue can hardly be considered “so settled” with only one appellate decision directly on point (Yapp v. Reno), a decision that was wrongly decided for the reasons just stated.
The majority next asserts that the understanding of Article 7 set forth by this dissent would open the door for people like Cruz Martinez to argue that the “lapse of time” provision also incorporates the Speedy Trial Act. This, the majority says, “introduces a serious complication” because the Speedy Trial Act’s provisions would be difficult to apply in extradition proceedings. Maj. Opn. at 467. But this concern is misplaced because Article 7, despite what the majority thinks, does not incorporate the statutory right. In contrast to the constitutional right, violations of the Speedy Trial Act do not “bar” a prosecution — ie., require that the charges be dismissed with prejudice. See 18 U.S.C. § 3162 (leaving the decision of whether to dismiss with prejudice to the discretion of the district court). The discretionary remedy provided by statute is inconsistent with the language of Article 7, which incorporates mandatory bars to prosecution. And even if the statute somehow did fall within Article 7, it contains an exclusion for “[a]ny period of delay resulting from the absence or unavailability of the defendant” that would render the seventy-day clock essentially irrelevant in extradition cases. 18 U.S.C. § 3161(h)(3)(A). The majority’s alarmist concern is therefore completely without merit.
*487 The majority also argues that comity requires a narrow interpretation of Article 7, but it fundamentally misunderstands the nature of the comity principles it cites. The majority suggests that we should be guided by the principle that U.S. courts must avoid “supervising the integrity of the judicial system of another sovereign nation.” Maj. Opn. at 463-64 (quoting Jhirad, 536 F.2d at 484-85). This principle, known as the rule of non-inquiry, “ ‘bars courts from evaluating the fairness and humaneness of another country’s criminal justice system, requiring deference to the Executive Branch on such matters.’ ” Hilton v. Kerry, 754 F.3d 79, 84-85 (1st Cir. 2014) (quoting Khouzam v. Att’y Gen. of U.S., 549 F.3d 235, 253 (3d Cir. 2008)).
This rule has a narrow scope and is typically cited only to bar inquiry into humanitarian concerns or a lack of procedural rights in a foreign criminal justice system. See id. at 83; Khouzam, 549 F.3d at 253; Prasoprat v. Benov, 421 F.3d 1009, 1016-17 (9th Cir. 2005); Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d Cir. 1990); see also Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830 (1911) (“We are bound by the existence of an extradition treaty to assume that the trial will be fair.”).
Although courts do not inquire into the fairness of criminal procedure or punishment under the laws of the country seeking extradition, it is clearly a court’s role to determine whether extradition is permissible under the terms of the governing treaty. Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 8-9, 57 S.Ct. 100, 81 L.Ed. 5 (1936). Similarly, the executive’s discretion to grant or deny extradition arises only after a person has been certified as extraditable under the governing treaty. Hoxha v. Levi, 465 F.3d 554, 564-65 (3d Cir. 2006). Nor, contrary to the majority’s suggestion, is it in any way inappropriate in our constitutional system for courts to enforce individual rights granted by a treaty in the appropriate exercise of habeas jurisdiction. Hamdi v. Rumsfeld, 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (“[T]he Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance, serving as an important judicial check on the Executive’s discretion in the realm of detentions.”).
Nowhere in this dissent is there any consideration or discussion of whether Cruz Martinez would face unfair treatment in Mexico. Cruz Martinez does not even make that argument. Rather, he is claiming that his extradition is barred under the terms of the governing treaty. The comity rule simply does not apply here, where both countries have willingly entered into a treaty granting and preserving the right which Cruz Martinez seeks to enforce.
III.
The majority’s premise — that the phrase “lapse of time” refers only to a fixed statutory limitations period — is not supported by any of the multitude of cases, treaties, or texts it cites. The majority points to no authority of any kind that associates this distinctive language with, much less restricts it to, statutes of limitation. “Lapse of time” is a phrase frequently used in connection with any number of legal doctrines that operate based on the passage of time — including speedy trial rights. These uses are too numerous and varied to permit the conclusion that the term “lapse of time” is so strongly or so inherently associated exclusively with statutes of limitation that the treaty’s drafters relied on it as a term of art to refer solely to statutes of limitation. Instead, the frequent use of the phrase in connection with constitutional speedy trial claims confirms that a literal reading of the text of Article 7 incorporates the Speedy Trial Clause.
*488 For these reasons, this case should be remanded for the district court to determine whether Cruz Martinez’s Speedy Trial Clause rights were violated.

. Judge White’s separate concurrence completely misunderstands or glosses over the Treaty’s reciprocal effect. The conclusory concurrence gives the misimpression that the crux of this case is reducible to whether the phrase "barred by lapse of time” gives Cruz Martinez a right to a speedy trial. But that phrase should not be read in isolation from the phrase that follows it — namely, "according to the laws of the requesting or requested Party.” 1978 Treaty, art. 7. Construed together, this language means that the Treaty incorporates the body of relevant law of both countries. And because the United States recognizes the speedy trial right, Cruz Martinez can raise that as a defense to his extradition to Mexico.

. The majority misapprehends this dissent's discussion of Doggett. Nowhere in this dissent is there any suggestion that Doggett sheds light on the meaning of “lapse of time.” Dog-gett tells us two things. First, that extraditees can raise a speedy trial defense when the U.S. government has failed to timely pursue their extradition to the United States. The result should be no different in this case, where the roles of the two countries are simply reversed. Article 7 offers a defense against extradition if prosecution would be “barred by lapse of time according to the laws of the requesting or requested Party.” The Treaty has a reciprocal effect: if criminal prosecution would be barred due to the lapse of time in the United States, then Cruz Martinez's extradition to Mexico must be refused. Second, the point of Doggett is to show that in some cases, there is a presumption of prejudice when the delay is significant (as it is here). As discussed on pages 16-17 of this dissent, Doggett is simply meant to illustrate that if Cruz Martinez was actually able to raise a speedy trial claim, he would probably prevail due to the similarities between his case and Doggett (where the delay of over eight years established a presumption of prejudice).

. See 18 U.S.C. § 3184 (conferring authority upon magistrate judges to issue warrants and conduct extradition proceedings).